### THE SUSANA.

### ROBINS DRY DOCK & REPAIR CO. v. STEAMSHIP SUSANA CORPORATION et al.

(Circuit Court of Appeals, Fourth Circuit. October 21, 1924.)

No. 2215.

**1. Maritime liens ☞52—Bail in suit in rem discharges lien on ship.**

Under ‘the English as well as the American law, a stipulation given for release of a ship seized in a suit in rem for the enforcement of a lien is a substitute for the ship, and the lien is transferred to it, and the ship released therefrom.

**2. Maritime liens ☞52 — Discharge of lien from ship held not to release owner from liability in personam.**

Where a decree in rem for enforcement of a lien against a ship was only partially satisfied from the bail given for her release, the owner, who created the debt, is not discharged from liability for the remainder, and his interest in the ship may be subjected to its payment, but only the interest he has at the time of attachment or levy.

**3. Shipping ☞33—Recording of mortgage on ship not a vessel of the United States not constructive notice.**

The recording in a customs house of a mortgage on a ship, which at the time the recording takes place is not a vessel of the United States, does not constitute constructive notice of the existence of such mortgage.

**4. Shipping ☞5—Place of registry of ship; residence of corporation is state of incorporation.**

Under Rev. St. § 4141 (Comp. St. § 7719), requiring a vessel to be registered in the district including the port to which she shall belong, which shall be that at or nearest to which the owner usually resides, a corporation owner is deemed to reside in the state of its incorporation.

**5. Shipping ☞32—Mortgage given by purchaser without re-registering vessel held invalid against attaching creditor.**

Under Rev. St. §§ 4170, 4192 (Comp. St. §§ 7751, 7778), providing that, when a registered vessel has been sold, she shall be registered anew, otherwise she shall cease to be deemed a vessel of the United States, and that no mortgage shall be valid against third parties without actual notice, unless recorded in the office of the collector where such vessel is registered, where a Delaware corporation purchased a vessel owned and registered in New York, but did not cause her to be re-registered, a mortgage given by it and registered only in New York *held* invalid as against an attaching creditor.

**6. Shipping ☞4—Statutes held not repealed by Ship Mortgage Act.**

The provision of Ship Mortgage Act, par. 4, subsec. B (Comp. St. Ann. Supp. 1923, § 8146¼k), that a vessel lawfully documented shall continue to be so documented until its documents are surrendered with the approval of the Shipping Board, did not repeal Rev. St. §§ 4170, 4192 (Comp. St. §§ 7751, 7778), requiring vessels sold to be registered anew, and providing that mortgages shall be recorded in the office of the collector where the ship is registered, but is applicable only to ships which were properly documented when preferred mortgages were put upon them, and is intended to prevent the transfer of such a vessel without the consent of the Board after the mortgage is placed on it.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Suit in admiralty by the Robins Dry Dock & Repair Company against the Steamship Susana, the Steamship Susana Corporation and the Equitable Trust Company of New York. From the decree, libelant appeals. Reversed and remanded.

John W. Oast, Jr., of Norfolk, Va. (J. Dexter Crowell, E. Curtis Rouse, and Crowell & Rouse, all of New York City, and Oast, Kelsey & Jett, of Norfolk, Va., on the brief), for appellant.

Edward R. Baird, Jr., of Norfolk, Va. (Murray, Aldrich & Roberts, of New York City, and Baird, White & Lanning and George M. Lanning, all of Norfolk, Va., on the brief), for appellees.

Before WOODS and ROSE, Circuit Judges.

ROSE, Circuit Judge. On the 30th of July, 1917, the American steamship Susana, then owned by what called itself F. I. A. T. and was a corporation of the state of New York, was permanently registered at the custom house of the port of New York. At some time before April 20, 1920, and in some way not disclosed by the record, her ownership became vested in the Steamship Susana Corporation, a body corporate of the state of Delaware. It will for brevity be styled the owner. In April, 1920, she was in need of somewhat extensive repairs, and the appellant, the Robins Dry Dock & Repair Company, hereinafter referred to as the repairman, was employed by the owner to make them. The work was begun on April 20, 1920, and was completed on the succeeding 8th of June. There is no controversy that the repairman's bill of $77,190.59 was fair and reasonable. After she had been put in condition, she sailed away, and on the 20th of August in the same year was in the St.

Lawrence river in the province of Quebec. The repair bill was then unpaid, and on the day last mentioned the repairman caused proceedings in rem for its collection to be instituted against her in the Exchequer Court of Canada for the Quebec Admiralty District. In drafting the initial pleading, the repairman asked for $77,190.59, without specifying in what currency the figures of its claim were expressed, and of course, in a court of Quebec, its demand was necessarily understood to be for the named number of Canadian dollars. Nobody concerned then thought of the fact that in the exchange markets of the world a Dominion dollar was worth appreciably less than was one of the United States. Out of that oversight this litigation arose.

On the 11th of September, 1920, the owner bailed its ship, furnishing a stipulation in the sum of $80,000 Canadian currency. This, of course, covered the claim as made, but fell short by several thousands of American dollars of being the equivalent in our money of the repairman's bill. Two months later the owner filed its written admission of the justice of the repairman's claims and its consent to a decree in the latter's favor. One was accordingly entered for $87,032.37, the sum in Canadian currency at that time the equivalent of the repairman's bill. The stipulators thereupon paid the $80,000 for which they had become bound, a sum which, however, would then procure but $69,047.81 in the currency of the United States. Seemingly it was only after the payment had been made and the case terminated that the repairman woke up to the fact that about $8,000 of its admittedly proper bill was still unpaid, although the ship upon which it had had its lien was worth much more than the amount of the latter. It bided its time until the 19th of March of the succeeding year, 1921, when, finding that the Susana was in the Eastern district of Virginia, it filed its libel against her in rem and against the owner in personam in form to recover its full original bill of $77,190.59, but in substance to secure the something over 10 per cent. of it still unpaid. On the 21st of March the ship was arrested in the in rem aspect of the proceedings, and attached in that in personam as the property of the respondent, the owner. On the 12th of April the owner excepted to the libel, on grounds not disclosed by the record before us, and on the overruling of its exceptions it on the 25th of April filed its answer setting up the court proceedings in Quebec. It is obvious that, while what had there taken place might be a complete defense of the ship against the claim in rem, it might not necessarily bar the demand in personam upon the owner.

Meanwhile, and before the filing of this answer, other things had happened, and a new party had made its appearance in the court, although it had not as yet come into the case brought by the repairman. The right of this later comer dates back to the 25th of the preceding June, a date two weeks subsequent to the completion of the repairs upon the ship, but almost nine months prior to the institution of the proceedings in which she was attached in the instant case. On the date just mentioned the owner had given a preferred mortgage upon her to the Equitable Trust Company of New York, hereinafter referred to as the mortgagee, to secure a 90-day note for $350,000, with interest at 5 per cent. On the 12th of April, 1921, three weeks after the ship had been attached at the instance of the owner, the mortgagee by its separate libel sought to foreclose this mortgage. It altogether ignored the pendency of the repairman's proceedings. Perhaps it had not then heard of them; more probably it supposed that they could not affect its rights, or the ways in which it might enforce them. Before arresting the ship, it obtained an order of the court below permitting it to do so, although there was no reference therein to the fact that she was already in the custody of the court. On the 29th of April the repairman filed in the mortgagee's case what it called a special appearance. In this it called the court's attention to its own earlier libel, and set up that the mortgage sought to be foreclosed was not a preferred mortgage, over the foreclosure of which the court was given jurisdiction by the Act of June 5, 1920, because there had been no notation upon it of the repair bills then due.

The marshal held the ship. It was earning nothing, and costing not a little. The owner did not offer to bail it. The sooner it was sold the better, especially as that could be done without prejudicing the rights of either repairman or mortgagee. Accordingly on the 5th of May the court ordered her sale. It gave the mortgagee permission to bid at the sale, and if it became the purchaser authorized it to pay all but $27,500 of the purchase money by crediting the excess upon the mortgage debt due it. The $27,500 was to be paid in cash, and the sale was not to prejudice the rights of the repairman or of some other intervening petitioners as against the proceeds. It is admitted that the amount required to be paid in cash was sufficient to cover all their demands. On the

25th of May, the court confirmed a sale to the mortgagee for $110,000.

Something over a year later, on the 12th of June, 1922, it passed an order consolidating the two libels, having a few days before referred both of them to a special master, with directions to ascertain and report the amounts respectively due the various parties and their priorities, if any, as among themselves. His report was filed on the 23d of May, 1923. In substance he held that certain intervening petitioners had made out their claims and their right to a preference over the mortgage. To so much of the order of the court as confirmed this portion of the master's report no objection has been taken, and no further reference to it need be made. He furthermore held that the Quebec proceedings finally extinguished the maritime lien, which prior thereto the repairman had upon the ship, so that it had no rights as against the ship in rem; that it still had a good claim in personam against the owner for the balance of its bill, and could assert such claim in the admiralty, but that under its attachment it could take nothing but the owner's interest in the ship at the time the attachment was levied, and at that time all the owner had in it was subject to the prior lien of the mortgagee. The ship had been sold, and had brought less than a third of the mortgage debt, so that the conclusion of the whole matter was the repairman could take nothing. From the decree of the court, confirming the report of the master, the repairman has appealed.

It assigns and argues many errors. A number of them challenge the procedural accuracy of various things that were done below. We find no merit in any of these. It may be argued that technical precision in admiralty pleading and practice might have required the taking of a somewhat different road to the end attained. We see no occasion to form, much less to express, any opinion on that question, because, even if we agreed with the repairman on the subject, we could not reverse if the decree of the court below gave to each of the parties that to which it was entitled. Act Feb. 26, 1919, 40 Stat. 1181 (Comp. St. Ann. Supp. 1919, § 1246).

The only substantial controversy is whether, under all the circumstances, the repairman's claim upon the proceeds of the ship rank that of the mortgagee. The repairs were ordered by the owner of the ship. It is not shown that the repairman, in making them, did not rely upon the ship. It therefore had a maritime lien upon her for its bill. They were completed before the mortgage was executed, and the repairman's lien for them was not affected by it. It follows that, except in so far as the situation was changed by what took place in the Quebec court, the repairman's claim upon the ship ranked that of the mortgagee.

[1] The repairman argues that under the English law, which in this respect prevails in Canada, its lien was unaffected by the proceedings there taken. In support of this contention, it has offered the testimony of an admittedly qualified expert, and in accordance with the usual practice in such matters the mortgagee has produced an equally learned and as highly qualified witness to swear that the gentleman who testified for the repairman was altogether wrong. Our task is made easier, however, by their mutual admission that their varying conclusions are necessarily based upon the conflicting interpretations they respectively put upon certain well-known English and Canadian cases. These they cite, and from them they quote. To determine which of them gives the more persuasive testimony, it is necessary to examine the authorities upon which they rely. They are The Freedom, L. R. 3 A. C. E. 495; The Dictator, [1892] Probate, 305; The Gemma, [1899] Probate, 285; The Dupleix, [1912] Probate, 8; The Aurora, 15 Exchequer Canada Rep. 23; The Kalamazoo, 15 Jurist, 884; The Wild Ranger, Browning & Lushington (1863–1865) 87; The Hew, Id. 447.

[2] We shall not attempt an analysis of what was said or decided in these cases. An examination of them reveals nothing which tends to sustain the contention of the repairman to the extent to which it must go, if it is to be of any use in the instant proceeding. The English law, as our own, treats the bail as the substitute for the ship. The liens asserted in the case in which it is given and accepted are, by its giving, transferred from the ship to it, and under any ordinary circumstances, at least, never return to the former. If in such case, or, for that matter, in any other, a judgment or decree goes against the owner in personam, whether arising out of the cause of action set up in the case in which the bail was given or out of any other ground of complaint, an execution may issue thereon, and it may be levied upon any property of the respondent not by law exempt from being taken under legal process. The particular piece of property levied upon, its nature, and its past history are equally immaterial. It makes no difference as to whether it is a horse, a farm, or a

ship, and, if it be the last named, to what vicissitudes it may earlier have been subject. It is enough that, at the time the levy is made upon it, it is the property of the judgment debtor; but it is only that which he then owns in it which can be taken.

It follows that in March, 1921, the repairman had no maritime lien upon the Susana and could assert no right in rem against her. It had a valid claim against the owner, which, as it arose out of a maritime contract, could be asserted in a court of admiralty. As the owner was not found in the district, its property in it could be attached in the admiralty proceedings in personam there instituted against it, but all that could be taken under the attachment was that which the owner then owned, subject to any valid liens upon it, whether they were maritime or nonmaritime.

The controversy therefore necessarily resolves itself into the inquiry whether the mortgagee had on the 19th of March, 1921, a valid lien upon the ship, good as against execution or attachment creditors of the owner. As between repairman and mortgagee, it makes no difference whether the mortgage in question was good as a preferred mortgage under the Ship Mortgage Act (Comp. St. Ann. Supp. 1923, §§ 8146¼jjj–8146¼rr) or not, if independently of that statute it was a good mortgage, binding the ship as against third parties creditors of the owner, but not having maritime liens upon it, as at the time the attachment was levied the repairman no longer had. Its rights against her were neither greater nor less than those of a nonmaritime creditor of the owner, except that, as its claim was maritime in origin, it had the right to invoke the aid of the admiralty for the recovery of its demand.

A. may be the owner of two ships, X and Y. B. may have a maritime lien upon X, and a right to hold A. liable in personam for the same claim. He may proceed in the admiralty against A. in personam, and may cause ship Y. to be attached. As against Y his claim will have no higher rank than if it were altogether nonmaritime. So far as concerns the instant case, the sections of the Merchant's Marine Act which provide for and regulate preferred mortgages may be as unconstitutional as the repairman says they are, or, although they be valid, the mortgagee may not be entitled to rely upon them because it has failed to see that the proper notations have been made upon the ship's papers, or because in other respects the requirements of the act have not been complied with, and yet the rights of the mortgagee to the proceeds of the Susana might still be superior to those of the repairman.

By what has been said we do not intend to intimate any opinion that the repairman is right as to any of these contentions. We do nothing more than point out that, except in one contingency, to be hereafter mentioned, neither of them is necessarily material to the case made by this record. Of course, we have not lost sight of the fact that, if the preferred mortgage provisions of the Ship Mortgage Act are invalid, or if the things which the act itself makes requisite to give a mortgage a preferred status are omitted, the court below would have had no jurisdiction in admiralty to entertain a proceeding for the foreclosure of the mortgage in question, or for that purpose to order a sale of the ship. But, even if it had not, the repairman was not hurt by what was in fact done, and is not in a position to complain of it. If the owner had no substantial beneficial interest in the ship at the time the attachment was levied, the repairman took nothing by its attachment, and what subsequently became of the ship is no concern of its, as admittedly the ship was not then worth anything like as much as the mortgagee's claim. The question of what title the purchaser took under the sale may be of interest to others, but upon this record not to the repairman.

The discussion comes back to the inquiry whether, prior to the Ship Mortgage Act, the mortgage held by the mortgagee would have been good against an attaching creditor having no lien upon the Susana, except that arising out of the attachment, and, if it would not have been, was it made good by anything in that act?

Upon behalf of the repairman, it is argued that apart, from the statute in question the mortgagee could have asserted no rights as against it for two reasons: First, because the ship, at the time the mortgage was executed and thereafter continuously until the levying of the attachment, was not a vessel of the United States, in that it was not documented as the law requires; and, second, because the mortgage was not recorded at the place the statute required to give it validity against persons having no actual knowledge of its existence.

The applicable provisions of section 4131, R. S. (Comp. St. § 7707), are: "Vessels registered pursuant to law and no others * * * shall be deemed vessels of the United States, and entitled to the benefits and privileges appertaining to such vessels." Section 4169 (Comp. St. § 7750) provides:

"In every case in which a vessel is required to be registered anew, if she shall not be so registered anew, she shall not be entitled to any of the privileges or benefits of a vessel of the United States." Section 4170 (Comp. St. § 7751) declares that "whenever any vessel, which has been registered, is, in whole or in part, sold or transferred to a citizen of the United States * * * the vessel shall be registered anew * * * otherwise she shall cease to be deemed a vessel of the United States." "The former certificate of registry of such vessel shall be delivered up to the collector to whom application for such new registry is made, at the time that the same is made, to be by him transmitted to the Register of the Treasury, who shall cause the same to be canceled. In every such case of sale or transfer, there shall be some instrument of writing, in the nature of a bill of sale, which shall recite, at length, the certificate; otherwise, the vessel shall be incapable of being so registered anew." Section 4192 (Comp. St. § 7778) provided that "no bill of sale, mortgage, hypothecation, or conveyance of any vessel, or part of any vessel, of the United States, shall be valid against any person other than the grantor or mortgagor, his heirs and devisees, and persons having actual notice thereof, unless such bill of sale, mortgage, hypothecation, or conveyance is recorded in the office of the collector of the customs where such vessel is registered or enrolled."

As these provisions demonstrate, Congress, from 1792 down, had always sought to insure, so far as was practicable, that a ship's papers should show who, at the time, owns the ship. A part of this solicitude has been due to its unwillingness to allow any ship not wholly owned by citizens of this country to acquire or attain the status of a vessel of the United States. Section 4142 of the Revised Statutes (Comp. St. § 7720), which is a mere codification of portions of the act of 1792 (1 Stat. 289), required, as a condition to the registry of a vessel either in the first instance or in consequence of the changing of ownership, an oath of one of its owners that he and all the other owners are citizens of the United States, and that "there is no subject or citizen of any foreign prince or state, directly or indirectly, by way of trust, confidence, or otherwise, interested in such vessel, or in the profits or issues thereof."

In the instant case the mortgage itself shows that the owner had not, at the time it gave the mortgage to the mortgagee, ever had the ship registered in its name as the law requires. It is not shown when the owner acquired title to the ship. It is not made to appear that any bill of sale was ever given by F. I. A. T. to the Steamship Susana Corporation, and, if one was, it does not seem to have been recorded. No showing is made that the Susana was out of the country when the owner acquired title to it, and indeed it affirmatively appears that after such title was acquired the ship was for almost two months at the yard of the repairman in New York. It follows that, at the time the mortgage was made and recorded at the office of the collector of New York, the ship was not entitled to be considered a vessel of the United States, or at all events would not have been, unless the Ship Mortgage Act has changed the law as it stood before its enactment.

[3] It is well settled that the recording at a custom house of a mortgage upon a ship, which at the time the recording takes place is not a ship of the United States, does not constitute constructive notice of the existence of such mortgage. In re Empire Shipbuilding Co. (C. C. A. 2d Circuit) 221 F. 223, 136 C. C. A. 633. Prior to the enactment of the Ship Mortgage Act, it is clear that the mortgage here in controversy would not, in the absence of actual knowledge of its existence have been good as against the repairman by reason of its recording at the office of the collector of customs at New York. Whether the act in question has in any way changed this situation will be discussed later on.

[4] Moreover, prior to that act, there can be no question that the law, literally construed, required the ship to be registered at the port nearest the residence of the owner, and a ship not there registered was not entitled to the status of a vessel of the United States. Now, at the time of the making and recording of the mortgage which is the basis of the claim of the mortgagee, the owner of the ship was the mortgagor, and as it was a Delaware corporation, and was in contemplation of law a resident of that state, the home port of the vessel was presumably Wilmington, and at all events was not New York, and yet the mortgage was recorded at New York, and not elsewhere.

There is a state decision that, where a corporation is the owner of a ship, it may treat the port at which it does business as the home port, apparently upon the theory that for business purposes it must, or at all events may, be regarded as a resident of the place at

which most of its shipping business is carried on. Moore v. Lincoln Park & S. S. Consolidated Co., 196 Pa. 519, 46 A. 857. However much of reasonableness there may be in this view, it is impossible to reconcile it with the long line of federal cases which have held that the residence of a corporation is in the state from which it holds its charter, and there would seem to be no sufficient reason to conclude that the words "usually resides" in the Navigation Law shall receive another construction than that so habitually given them in other matters. It is true that in certain tax cases which went to the Supreme Court the vessels concerned were registered or enrolled at ports which were hundreds of miles from the state by which the corporate owner of them was chartered, but the question whether they were or were not properly registered or enrolled was regarded as immaterial in those cases, and there was no discussion of it.

Unquestionably the court said, in Southern Pacific Co. v. Kentucky, 222 U. S. 68, 32 S. Ct. 13, 56 L. Ed. 96, that sections 4141 and 4178, Revised Statutes (Comp. St. §§ 7719, 7758), give to the owner the right to mark upon the stern of his vessel, either the name of the place of enrollment, the place where the vessel was built, or the place where the owner resides. It is obvious that what the court had in mind was the provisions of section 21 of the act of 1884 (chapter 121, 23 Stat. 58 [Comp. St. § 7759]). That simply provided that the word "port," as used in sections 4178 and 4334 of the Revised Statutes, *"in reference to painting the name and port of every registered or licensed vessel on the stern of such vessel,* shall be construed to mean where the vessel is registered or enrolled or the place *in the same district* where the vessel was built or where one or more of the owners reside." (The italics are ours.) In Ayer & Lord Co. v. Kentucky, 202 U. S. 409, 26 S. Ct. 679, 50 L. Ed. 1082, 6 Ann. Cas. 205, the history and limited scope of this section of the act of 1884 is fully explained.

There is nothing in any of these tax cases to suggest that the Supreme Court intended in any way to limit or withdraw the approval it gave in White's Bank v. Smith, 7 Wall. 646, 19 L. Ed. 211, to Mr. Justice Clifford's decision in Blanchard v. The Martha Washington, 3 Fed. Cas. 1513, that a mortgage on a vessel sailing under a provisional or temporary registry must be recorded in her home port. The question was there fully considered, in view of the conflict between Mr. Jus-

tice Clifford's views and those of the Supreme Judicial Court of Massachusetts in Potter v. Irish, 10 Gray, 416, and of the Supreme Court of Maine in Chadwick v. Baker, 54 Me. 9.

[5] It would seem that, unless the previous law in the respects above discussed has been altered by the Ship Mortgage Act of June, 1920, the recording of the mortgage here in controversy at the port of New York did not give the repairman constructive notice of its existence, and that for two reasons: First, because, at the time the recording was made, the vessel was no longer entitled to the status of a vessel of the United States; and, second, because the mortgage was recorded at the wrong port.

[6] It is, however, urged on behalf of the mortgagee that this whole law has been changed by paragraph 4, subsection B, of the Ship Mortgage Act (Comp. St. Ann. Supp. 1923, § 8146¼k), which says: "The term 'vessel of the United States' means any vessel documented under the laws of the United States and such vessel shall be held to continue to be so documented until its documents are surrendered with the approval of the Board." In other words, the mortgagee contends that the Susana was once properly documented in the port of New York by F. I. A. T., and that such documentation continued until its documents had been surrendered with the approval of the Shipping Board, and that therefore, as no such surrender has been made, the ship is still properly documented.

The repairman answers that that definition quoted is applicable only to vessels which were properly documented when the preferred mortgage was put upon them, and is intended merely to prevent the transfer, without the consent of the Board, of the documentation of the vessel after a preferred mortgage has been put upon it. No consent of the board is necessary to the surrender of the documents of an unmortgaged ship. The conditions and apparently the only conditions under which the Board must be consulted are set forth in subsection O, paragraphs (a) and (d) being Comp. St. Ann. Supp. 1923, § 8146¼oo. The former provides that "documents of a vessel of the United States covered by a preferred mortgage may not be surrendered (except in the case of a forfeiture of the vessel or of its sale by the order of any court of the United States or any foreign country) without the approval of the Board," and directs that the "Board shall refuse such approval unless the

mortgagee consents to such surrender." Paragraph (d) provides that "no rights under a mortgage of a vessel of the United States shall be assigned to any person not a citizen of the United States without the approval of the Board," and declares that any "assignment in violation of any provision of the section shall be void."

There is in all of this no suggestion that Congress intended to omit any of the requirements of the law intended to assure that at all times vessels should be registered in the names of their owners. The obvious purpose of what the mortgagee now relies upon was simply to prevent the transfer, without the consent of a mortgagee, of a mortgagor's title to a vessel covered by a preferred mortgage.

The reason for these provisions is plain enough. The mortgagor in possession of a ship may take it anywhere and may employ it in almost any fashion. The security of the mortgage may well depend upon his character, sound judgment, and experience, and a mortgagee, who would lend money to one *who in his opinion possesses sufficient of* these qualities to make the loan a safe one, might reasonably object to the ship being turned over to the ownership and control of another. The intention of Congress not to relax its immemorial diligence to make sure that no one but an American citizen shall under any ordinary circumstances have an interest in any vessel of the United States is demonstrated by the provisions of paragraph (d) above quoted, requiring the consent of the Shipping Board to the acquirement by an alien of any interest even in a preferred mortgage on a ship, and by the declaration of paragraph (e) that "no vessel of the United States shall be sold by order of the District Court of the United States in any suit in rem in admiralty to any person not a citizen of the United States."

We are constrained, therefore, to agree with the conclusion to which District Judge Brewster of the District of Massachusetts came upon rehearing in the case of The Lincoln Land, 295 F. 358, 1924 A. M. C. 194, that paragraph 4 of section B of the Ship Mortgage Act is not applicable to a situation such as is here disclosed. It follows that so much of the decree below as awarded preference to the mortgagee over the claim of the repairman must be reversed, and the cause remanded, with directions to allow the claim of the repairman out of the fund in court.

Reversed.