**J. G. JACKSON and J. G. Jackson, Jr.,**
**Intervenors, Appellants,**

v.

**INLAND OIL AND TRANSPORT CO.,**
**Appellee.**

**No. 19579.**

United States Court of Appeals
Fifth Circuit.

April 19, 1963.

Rehearing Denied June 25, 1963.

Edward S. Bagley, New Orleans, La., for appellants, Benjamin W. Yancey, Terriberry, Rault, Carroll, Martinez & Yancey, New Orleans, La., of counsel.

William S. Stone, Jack G. Carinhas, Jr., New Orleans, La., for appellee, Deutsch, Kerrigan & Stiles, New Orleans, La., of counsel.

Before RIVES and CAMERON, Circuit Judges, and BOOTLE, District Judge.

RIVES, Circuit Judge.

This appeal is from a decree ranking claims against the proceeds derived from the sale by the United States Marshal of the Tug Three Jacks, formerly owned

by Gulf Transportation Company. Only two claims are now involved. The district court ranked the claim of appellee, Inland, as superior to that of appellants, the Jacksons. Inland had chartered to Gulf, the owner of the Three Jacks, certain oil barges, and had secured a judgment against Gulf to recover the unpaid charter hire. Gulf had purchased the Three Jacks from the Jacksons and, to secure the unpaid part of the purchase money, had granted to the Jacksons a nonmaritime mortgage.

At the outset certain jurisdictional questions must be decided. Inland insists that the Jacksons' ordinary common-law mortgage is beyond the pale of jurisdiction, and cannot be foreclosed or enforced in admiralty. The Jacksons concede that their mortgage cannot be made the subject of an original libel in admiralty, nor can it support a seizure in rem of the vessel. The principle was clearly expressed by Mr. Justice Matthews on circuit in the early case of The Guiding Star, Cir.Ct.S.D. Ohio, 1883, 18 F. 263, 264:

> "The jurisdiction of the court, sitting in admiralty, is founded upon the nature of the liens sought to be enforced by its process, as maritime, although as to any surplus of the proceeds of sale remaining after satisfaction of all maritime liens, it will, having acquired jurisdiction as an admiralty court, proceed upon principles of equity to dispose of the entire fund, awarding it to the claimants, either as owners of the vessel or as having, either at law or in equity, by contract or liens, succeeded to the owners' rights."

See also, Andrews v. Wall et al. 1845, 3 How. 568, 44 U.S. 568, 572, 11 L.Ed. 729.

Again, in The J. E. Rumbell, 1893, 148 U.S. 1, 15, 13 S.Ct. 498, 501, 37 L.Ed. 345, the Court said:

> "An ordinary mortgage of a vessel, whether made to secure the purchase money upon the sale thereof, or to raise money for general purposes, is not a maritime contract.

A court of admiralty, therefore, has no jurisdiction of a libel to foreclose it, or to assert either title or right of possession under it. The John Jay, 17 How. 399 [15 L.Ed. 95]; The Eclipse, 135 U.S. 599, 608 [10 S.Ct. 873, 34 L.Ed. 269]. But it has jurisdiction, after a vessel has been sold by its order, and the proceeds have been paid into the registry, to pass upon the claim of the mortgagee, as of any other person, to the fund, and to determine the priority of the various claims, upon petitions such as were filed by the mortgagees and the material-men in this case. The Globe, 3 How. 568, 573 [11 L.Ed. 729]; The Angelique, 19 How. 239 [75 L.Ed. 625]; The Lottawanna, 21 Wall. 558, 582, 583 [22 L.Ed. 654]; Rule 43 in Admiralty."

The litigation in this matter began on April 2, 1959 when Inland filed a libel, in personam, against Gulf Transportation Company to recover the unpaid charter hire. On April 4, 1959 the Marshal executed the writ of foreign attachment issued under that libel "by seizing and taking into custody the within named Tug Three Jacks engines, tackle, etc. as she lay in Bayou Sorrell at Plaquemine, La."

On May 12, 1959, the court permitted the Jacksons to file their petition for intervention asserting the mortgage claim which is the subject of this appeal. In their intervention the Jacksons prayed for preference and priority over Inland's claim "in and to the proceeds which may be realized from any sale of the * * * Three Jacks. * * *"

Gulf consented that Inland's claim might be reduced to final decree, and the Jacksons also agreed (by letter) "that you would proceed to obtain a final decree without reference to any execution against the Three Jacks." On May 29, 1959, the court entered a final in personam decree in favor of Inland against Gulf for $21,948.37, plus interest and costs.

Meanwhile, on May 26, 1959, a libel in rem had been filed by Avondale Marine Ways seeking to recover the cost of certain repairs performed by Avondale on the Three Jacks. On June 2, 1959, the Marshal executed the admiralty warrant issued on that libel by seizing the Three Jacks. On June 12, 1959, the court permitted the Jacksons to file a duplicate petition for intervention in that proceeding.

While the Three Jacks remained in the custody of the court under the seizure by Avondale Marine Ways, Inland caused its decree against Gulf, in personam, to be recorded in the office of the County Clerk for Harris County, Texas, on February 10, 1960, and on February 26, 1960, caused the same decree to be filed in the records of the Clerk of Court for the Parish of East Baton Rouge, State of Louisiana, where the Three Jacks was actually located during the time when she remained under seizure. On March 4, 1960, the Three Jacks was sold by the Marshal under a writ of *venditioni exponas* issued in the proceeding instituted by Avondale Marine Ways.

The Three Jacks sold for $38,000.00. Avondale Marine Ways and other admittedly prior claimants have been permitted to withdraw the amounts of their claims. Meanwhile, Gulf had filed a petition in bankruptcy which is still pending. See Parks v. B. F. Leaman & Son, Inc., 5 Cir., 1960, 279 F.2d 529. The proceeds of sale remaining in the registry are considerably less than the sum of the combined claims of Inland, $22,445.44 principal, and of the Jacksons, $31,000.-00 principal. A determination of priority between the two claims is therefore essential. All libels were consolidated for the ranking of claims.

■ Under the doctrine of The J. E. Rumbell, supra, it is clear ·that the admiralty court has jurisdiction to make a proper distribution of the proceeds of sale, and to determine the priority of all claims, including that of the Jacksons on their nonmaritime mortgage.

■ Inland calls attention that the Jacksons intervened before, and not aft-

er, the Marshal's sale of the Three Jacks, and insists that their right under Admiralty Rule 42 accrued only after the proceeds of the sale were deposited in the registry. Our cases of Point Landing v. Alabama Dry Dock & Shipbuilding Co., 5 Cir., 1958, 261 F.2d 861, 866, and Crabtree v. The SS Julia, 5 Cir., 1961, 290 F.2d 478, 481, illustrate the liberality necessarily required in the allowance of interventions to assert claims against the proceeds of the sale of a vessel. It may be, as held in United States v. Maryland Casualty Co., 5 Cir., 1956, 235 F.2d 50, 52, 53, that nonmaritime claims cannot, prior to the sale, intervene against the proceeds as a matter of "right," but that case makes it clear that a "permissive" intervention may take place earlier. Such earlier intervention may, indeed, be necessary to defend against the establishment of maritime liens and the consequent depletion of the fund upon which the nonmaritime claimant must rely. Gray v. Hopkins-Carter Hardware Co., 5 Cir., 1929, 32 F.2d 876, 879; The Rupert City, W.D.Wash.1914, 213 F. 263, 266. See also, Schuchardt, et al. v. Ship Angelique, 1856, 60 U.S. (19 How.) 239, 241, 15 L.Ed. 625.

We conclude that the district court had jurisdiction over the Jacksons' nonmaritime claim.

■ Inland next urges that the notice of appeal was not timely so as to vest jurisdiction in this Court. The final decree ranking claims was rendered January 29, 1962. That decree recognized that the Jacksons had a right to take a "timely appeal":

"In view of the dispute between INLAND OIL & TRANSPORT CO. and J. G. JACKSON and J. G. JACKSON, JR., as to the right to the aforesaid proceeds, and the advices of proctors for J. G. JACKSON and J. G. JACKSON, JR., that they contemplate an appeal from this decree, INLAND OIL & TRANSPORT CO., has agreed that the aforesaid funds, except as to keeper's fees due to proctors for INLAND OIL & TRANSPORT CO.,

and except as to the funds due to AVONDALE MARINE WAYS, INC., should not be disbursed at this time; provided that J. G. JACKSON and J. G. JACKSON, JR. timely appeal from the decree entered herein.

\*    \*    \*    \*    \*    \*

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, since proceeds in the registry of this court are sufficient to cover the claim of INLAND OIL & TRANSPORT CO., with interest and costs, J. G. JACKSON and J. G. JACKSON, JR., shall, considering the consent of INLAND OIL & TRANSPORT CO., be relieved of the necessity of posting supersedeas pending their timely appeal from the decree entered herein."

The notice of appeal was filed February 19, 1962.

On two earlier occasions, prior to any hearing of evidence or trial for determination of their rights, the Jacksons had moved for summary relief and the court had denied those motions. In the final decree of January 29, 1962, the court recites that on oral argument on October 12, 1960, on the Jacksons' motion for rehearing from the court's second denial of summary relief, it "ruled that the ground of its decision was the failure of the Jacksons to record their ordinary mortgage in Harris County, Texas." Nonetheless, these earlier rulings amount to no more than a refusal to grant summary relief and do not deprive the Jacksons of the right to appeal from the final decree ranking claims. The appeal was timely and this Court has jurisdiction.

### Inland's Claim

■■ If Inland had been so fortunate as to intercept any cargo being transported in its oil barges it might have had a lien on that cargo for its unpaid charter hire (Gilmore and Black, The Law of Admiralty, p. 517) but it had no lien on the Tug Three Jacks. Accordingly, its original libel against Gulf was purely in personam with a claim for foreign attachment. Admiralty Rules 2, 5 and 36 relate to such attachments. Their purpose is two-fold: "to obtain jurisdiction of the respondent in personam through his property and to the extent of his property; and to obtain security." 2 Benedict on Admiralty, 6th ed., § 288, p. 346. The execution of the writ of attachment by seizing the Three Jacks did not convert the suit into one in rem. Defense Plant Corporation v. United States Barge Lines, 2d Cir., 1944, 145 F.2d 766, 767; Brown v. C. D. Mallory & Co., 3rd Cir., 1941, 122 F.2d 98, 104, 105. In the latter case, it was said:

> "An action in personam in admiralty begun by foreign attachment does not become an action in rem when property is seized. The lien of the attachment is in no wise the equivalent of the ordinary maritime lien enforced against the vessel by an admiralty proceeding in rem. The maritime lien is a secret one with qualities of paramountcy which may operate against general creditors or purchasers without notice. The lien secured by the appellant in the case at bar has no such attributes. It is simply a lien resulting from the attachment of the thing seized and possesses no quality of paramountcy.
> \*    \*    \*"

■ The recording of Inland's final decree against Gulf in Harris County, Texas, and in East Baton Rouge Parish, Louisiana, fastened no lien on the Three Jacks. Under the federal statutes, 28 U.S.C.A. §§ 1962, 1963, the judgment when so recorded became "a lien on the property located in such State in the same manner, to the same extent and under the same conditions as a judgment of a court of general jurisdiction in such State." Under the Texas statute, Article 5449 of the Vernon's Ann. Revised Civil Statutes of Texas, the lien of a recorded judgment is limited to real estate. Louisiana statute, Louisiana Revised Statutes 13, § 4204, provides as follows:

> "All judgments rendered by United States courts of original juris-

diction in Louisiana, when recorded in the mortgage records of any parish shall rank as judicial mortgages against all of the immovable property of the judgment debtor situated in the parish to the same extent and effect given by Louisiana law to the recorded judgments of the courts of this state."

It results that Inland's final decree against Gulf did not operate as a lien on any property until it was recorded, and then only on real estate or immovable property; it did not become a lien on the Three Jacks.

■ Inland does, however, hold a final decree in admiralty against Gulf, the owner of the Three Jacks, based on unpaid charter hire, which is a claim maritime in its nature. Atkins v. Fibre Disintegrating Co., 1873, 18 Wall. 272, 85 U.S. 272, 21 L.Ed. 841; Gilmore and Black, The Law of Admiralty, Secs. 4–1 to 4–24, pp. 170 to 219. Further, while Inland has not secured a maritime lien, it has obtained some kind of security by its attachment. Brown v. C. D. Mallory & Co., supra; Benedict on Admiralty, cited supra; compare Admiralty Rule 5.

### The Claim of the Jacksons

■ The Three Jacks is a towboat of less than 200 gross tons, being only 68.86 tons. The Jacksons' mortgage on the Three Jacks is not therefore covered by the Ship Mortgage Act of 1920, 46 U.S. C.A. §§ 911–984, see particularly § 922, is not a "preferred mortgage", entitled to "preferred status," but remains a common-law nonmaritime contract. Gilmore and Black, The Law of Admiralty, §§ 9–50, p. 574.

The Three Jacks was built at Angleton, Texas, by the Jacksons, d/b/a Jackson Towing Company, and enrolled at Houston, Texas, on February 9, 1954. On April 26, 1955 the Jacksons executed a Bill of Sale to Gulf Transportation Company, and took back a purchase money mortgage from Gulf to secure a principal note in the sum of $115,000.00. As will later appear, Inland makes a point of the fact that the mortgage was not acknowledged by Gulf's President until May 4, 1955. On that same date, a prior existing mortgage for $40,000.00 was satisfied of record in the office of the Collector of Customs at Houston, Texas. On May 17, 1955, the Three Jacks was re-enrolled at Houston in Gulf's name. On that same date the Bill of Sale to Gulf and the mortgage back to the Jacksons were recorded in the Customs Office at Houston. The mortgage was *not* recorded in the manner prescribed by Articles 5489 and 5490 of the Vernon's Ann. Revised Civil Statutes of Texas.[1]

■ Under Texas law, a chattel mortgage is effectual as between the parties without being recorded. Keller v. Smalley, 1885, 63 Tex. 512; Higgins v. Robertson, Tex.Civ.App.1948, 210 S.W.2d 250, 253. If not recorded, however, the mortgage is void as against even the "quasi lien" of a creditor who has caused a writ of attachment to be levied on the property. Thatcher v. Jeffries, Tex.Civ.App. 1905, 91 S.W. 1091, 1092. See also, 36 Tex.Jur., Records and Registration Acts, § 102, pp. 590–592.

### Priority Between the Two Claims

As has been developed, at the time Inland acquired some kind of security by the levy of its attachment on April 4,

---

1. Article 5489 provides that "[a]ll reservation[s] of the title to or property in chattels, as security for the purchase money thereof, shall be held to be chattel mortgages, and shall, when possession is delivered to the vendee, be void as to creditors and bona fide purchasers, unless such reservations be in writing and registered as required of chattel mortgages."

Article 5490 provides that "[e]very chattel mortgage * * * or other instrument of writing, intended to operate as a mortgage, or lien upon personal property * * * shall be absolutely void as against the creditors of the mortgagor or person making same, as against subsequent purchasers and mortgagees or lien holders in good faith" unless recorded in the county of the mortgagor's residence (Harris County, in this case), and this recordation must be "in the office of the County Clerk."

1959, the Jacksons' mortgage had been recorded in the office of the Collector of Customs at Houston since May 17, 1955, but it had never been recorded in the office of the Clerk of Court in Harris County, Texas, in the manner prescribed by the Texas State statutes. The recording in the Customs Office at Houston was authorized by a section of the Ship Mortgage Act of 1920, now appearing as 46 U.S.C.A. § 921:

"§ 921. *Sale, conveyance, or mortgage of vessel of United States; record*

"(a) No sale, conveyance, or mortgage which, at the time such sale, conveyance, or mortgage is made, includes a vessel of the United States, or any portion thereof, as the whole or any part of the property sold, conveyed, or mortgaged shall be valid, in respect to such vessel, against any person other than the grantor or mortgagor, his heir or devisee, and a person having actual notice thereof, until such bill of sale, conveyance, or mortgage is recorded in the office of the collector of customs of the port of documentation of such vessel, as provided in subsection (b) of this section.

"(b) Such collector of customs shall record bills of sale, conveyances, and mortgages delivered to him, in the order of their reception, in books to be kept for that purpose and indexed to show—

"(1) The name of the vessel;

"(2) The names of the parties to the sale, conveyance, or mortgage;

"(3) The time and date of reception of the instrument;

"(4) The interest in the vessel so sold, conveyed, or mortgaged; and

"(5) The amount and date of maturity of the mortgage."

The Ship Mortgage Act of 1920 added a new classification of ship mortgage, the Preferred Ship Mortgage. See Gilmore and Black, The Law of Admiralty, §§ 9–

47, et seq., pp. 568, et seq. That it did not otherwise detract from, add to, or affect the status, priority or effect of an ordinary mortgage of a vessel is shown by the following provision in the Historical Note to 46 U.S.C.A. § 921:

"Ship Mortgage Act June 5, 1920, contained this provision which is omitted from the Code: 'Sections 4192 to 4196, inclusive, of the Revised Statutes of the United States, as amended, and the Act entitled "An Act relating to. liens on vessels for repairs, supplies, or other necessaries," approved June 23, 1910, are repealed. This section, however, so far as not inconsistent with any of the provisions of law so repealed, shall be held a reenactment of such repealed law, and any right or obligation based upon any provision of such law and accruing prior to such repeal, may be prosecuted in the same manner and to the same effect as if this Act had not been passed.' "

Section 4192 of the Revised Statutes first appeared as the Act of July 29, 1850, c. 27, § 1, 9 Stat. 440, and provides in part: "[N]o bill of sale, mortgage, hypothecation, or conveyance of any vessel, or part of any vessel, of the United States, shall be valid against any person other than the grantor or mortgagor, his heirs and devisees, and persons having actual notice thereof; unless such bill of sale, mortgage, hypothecation, or conveyance be recorded in the office of the collector of customs where such vessel is registered or enrolled. * * *"

In White's Bank of Buffalo v. Smith, 1868, 74 U.S. (7 Wall.) 646, 655, 656, 19 L.Ed. 211, the Supreme Court upheld the power of Congress to pass this recording act, and further commented on its superiority over the systems of recording provided by the laws of the several states:

"Previous to this act of 1850, providing for the recording of bills of sale, mortgages, &c., of vessels, they were required to be filed, by the laws of many of the States, in the clerk's office, or some place of public deposit

in the town or city where the vendor or mortgagor resided, in order to protect the interest of the vendee or mortgagee against subsequent *bona fide* purchasers or mortgagees. And this practice continued in many places after the passage of the act of 1850, for abundant caution, on account of a doubt as to the effect that would or might be given to it as a recording act, from the very imperfect provisions of the law. There can be no doubt, however, but that the system of recording these instruments in the collector's office, at the home port of the vessel, furnishes a much readier opportunity to persons dealing in this species of property, to obtain a knowledge of the condition of the title, than by the former mode under the State law. * * *" (74 U.S. at 651.)

" * * * In this respect, the system of recording in the collector's office possesses very great advantages over the filing of these instruments in the clerks' offices where the vendor or mortgagor happened to reside at the time, as no means exists, under this practice, by which the subsequent purchaser or mortgagee, by any diligence, could obtain a knowledge of the actual condition of the title." (74 U.S. at 654.)

In Aldrich v. Aetna Ins. Company, 1869, 75 U.S. (8 Wall.) 491, 497, 19 L. Ed. 473, in commenting upon the holding in White's Bank v. Smith, supra, the Court said: "The court regarded the law as a registration act, which excluded all State legislation in respect to the same subject; and, looking at the nature and character of the species of property Congress was dealing with, we entertained no doubt as to its power to pass this law."

That those decisions remain in effect appears from the following citations: Madruga v. Superior Court, 1954, 346 U.S. 556, 559, 74 S.Ct. 298, 98 L.Ed. 290; Stewart & Co. v. Rivara, 1927, 274 U.S. 614, 618, 47 S.Ct. 718, 71 L.Ed. 1234; The Vigilancia, 2 Cir., 1896, 73 F.

452, 455; The Gordon Campbell, W.D. N.Y.1904, 131 F. 963, 966; The Jean L., S.D.Fla., 1923, 286 F. 727, 729.

■ The enactment "is a mere registry act, intended to prevent mortgages and other conveyances of vessels from having any effect (which they might have had before) against persons other than the grantor or mortgagor, and those claiming under him, or having actual notice thereof, unless recorded as therein provided. White's Bank v. Smith, 7 Wall. 646 [19 L.Ed. 211]; Aldrich v. Aetna Co., 8 Wall. 491 [19 L.Ed. 473]." The J. E. Rumbell, 1893, 148 U.S. 1, 16, 13 S. Ct. 498, 501, 37 L.Ed. 345.

As was said in Stewart & Co. v. Rivara, supra:

"The Recording Act was passed to furnish information as to title and to protect bona fide purchasers. White's Bank v. Smith, 7 Wall. 646, 655 [19 L.Ed. 211]. The Act expressly declares that it does not affect the title to vessels as between the parties to the transactions to which it applies. Congress has not undertaken to regulate contracts for conditional sales of vessels or other property used to carry on interstate commerce. It has not entered the field occupied by the state law in question." 274 U.S. at 618, 47 S. Ct. at 720.

■ The Bill of Sale from the Jacksons to Gulf and the mortgage back from Gulf to the Jacksons were both dated April 26, 1955. The date of acknowledgment of the Bill of Sale does not appear, but the mortgage was acknowledged on May 4, 1955. Both instruments were recorded in the Customs Office simultaneously at 4:00 P.M. on May 17, 1955. Inland argues that to be entitled to the benefit of the federal recording act, the Three Jacks must be a "vessel of the United States" at the time the mortgage "is made." 46 U.S.C.A. § 921(a), and that the vessel's enrollment had collapsed on the date of the bill of sale, April 26,

1955, by virtue of Section 3.32 of Title 19, C.F.R., which provides:

"(a) Except as stated in § 3.35 [not applicable], when a documented vessel is sold or transferred in whole or in part to a citizen, such vessel shall not be deemed a vessel of the United States until documented anew."

To this technical and narrow contention there are at least three answers. First, the U. S. Customs Abstract shows the date of both instruments as April 26. Each must have been acknowledged before it was admitted to record. 46 U.S.C.A. § 926(b); 19 C.F.R. § 3.33(g). There is no evidence in the record to show that the acknowledgment of the Bill of Sale was taken at an earlier time than the acknowledgment of the mortgage. Second, the bill of sale and purchase money mortgage were obviously intended by the parties to be "made" simultaneously, and the cases relied on by Inland are not applicable on their facts.[2] Third, the Three Jacks had not only been previously enrolled, but was covered by a mortgage to The First National Bank of Angleton which had been recorded in the customs office on December 6, 1954, and was not satisfied of record until May 4, 1955, when the mortgage to the Jacksons was acknowledged. It is true that The Susana, note 2 supra, refers particularly to a preferred mortgage (2 F.2d 415, 416), but in view of 46 U.S.C.A. § 921, quoted supra, we think that an ordinary mortgage is no less protected by the provisions of 46 U.S.C.A. § 840.

"§ 840.  *Documented vessels*

"Any vessel registered, enrolled, or licensed under the laws of the United States shall be deemed to continue to be documented under the laws of the United States within the meaning of subdivision (b) of section 835 of this title, until such registry, enrollment, or license is surrendered with the approval of the Secretary of Commerce, the provisions of any other Act of Congress to the contrary notwithstanding."

We conclude that neither Inland nor the Jacksons have a maritime lien; but that on principles of equity, the Jacksons' common-law mortgage, of which Inland was given notice by the recording provided by 46 U.S.C.A. § 921, was superior to any security which Inland later acquired by its attachment or by its subsequent final decree.  The judgment is therefore reversed and the cause remanded with directions to rank the claim of the Jacksons as superior to that of Inland.

Reversed with directions.

## ON PETITION FOR REHEARING

PER CURIAM.

One comment seems appropriate.  Appellee insists that 46 U.S.C.A. § 840 "deals only with sales and mortgages of vessels to foreign nationals during periods of war and national emergencies, as its reference to 46 U.S.C. 835 clearly shows."  We do not pass upon that insistence because 46 U.S.C.A. § 911(4) is not so limited, and provides in the same language that "such vessel

---

2. In In re Empire Shipbuilding Company, 2 Cir., 1915, 221 F. 223, the vessel had never been registered or enrolled, but was described in the mortgage as "still being in course of construction" and "to be hereafter registered or enrolled with the collector of customs."  The court held that the subsequent completion and enrollment of the vessel changed the status of the vessel itself, but did not change "the status of the mortgage, which was made two months before, when the vessel was yet incomplete."  221 F. at 226.  In the other case relied on by Inland on this point, The Susana, 4 Cir., 1924, 2 F.2d 410, the ship was not a vessel of the United States at the time the recording took place, and the court's holding was: "It is well settled that the recording at a custom house of a mortgage upon a ship, which at the time the recording takes place is not a ship of the United States, does not constitute constructive notice of the existence of such mortgage."  2 F.2d p. 414.

811

shall be held to continue to be so documented until its documents are surrendered with the approval of the Secretary of Commerce."

Appellee's petition for rehearing is denied.