**WALTER E. HELLER & COMPANY,**
Plaintiff,

v.

**M/V MR. ED, her engines, tackle, furniture, apparel, etc., Defendant.**

No. 8322.

United States District Court
E. D. Louisiana,
New Orleans Division.

July 13, 1967.

John W. Futrell, New Orleans, La., for plaintiff.

A. D. Freeman, Jr., New Orleans, La., for Delta Marine, Inc.

E. Burt Harris, New Orleans, La., for M & W Marine Ways, Inc.

Leopold Stahl, New Orleans, La., for Diesel Engine Repairs, Inc. and American Marine & Equipment Co., Inc.

Fritz H. Windhorst, New Orleans, La., for Gator Supply Co., Inc.

RUBIN, District Judge.

This case raises the question whether a mortgage on a vessel by a person who is in fact the owner, signed at a time when the vessel is not registered in the

owner's name, becomes a preferred ship mortgage if he thereafter registers both the documents of ownership and the mortgage. It arises in the following context.

On June 30, 1966, Walter E. Heller & Company, libelant, filed a libel, in rem, against the M/V MR. ED, to enforce a mortgage granted by J & M Equipment Rental, Incorporated, the owner. The vessel was seized and sold by the United States Marshal, and the net proceeds were deposited in the registry of the court. Five claimants intervened asserting maritime liens against the vessel. The intervenors are: M & W Marine Ways, Inc.; American Marine & Equipment Co., Inc.; Delta Marine, Inc.; Diesel Engine Repairs, Inc.; and Gator Supply Co., Inc.

Heller filed a motion to have the mortgage declared a valid preferred ship mortgage, to have judgment entered in the amount of $29,699.50 and to have the net proceeds deposited in the registry of the court disbursed to him. These proceeds amount only to $8,850.00, and Heller's counsel concedes that Heller cannot obtain judgment for more than that.

The intervening claimants deny that the mortgage is a preferred ship mortgage, and assert that the mortgagee's rights are subordinate to theirs. They argue that the MR. ED was not a "vessel of the United States" at the time the mortgage was executed, and therefore the mortgage is not entitled to the benefit of the Ship Mortgages Act of 1920.[1]

The MR. ED is an oil screw built in the United States with gross tonnage of 34.51 tons. The vessel was enrolled at Cincinnati, Ohio, in 1960 by National Leasing Company, Inc. On September 26, 1960, National granted an ordinary mortgage to Heller, which was recorded on October 5, 1960. This mortgage was satisfied of record on July 13, 1965. The trustee of National sold the MR. ED to Heller on June 16, 1965. Heller sold the vessel to J & M Equipment Rental, Inc. on June 17, 1965. The mortgage which is the subject of this litigation was executed on June 21, 1965, as security for the purchase price. The sales from National to Heller and from Heller to J & M, and the mortgage were all recorded on July 13, 1965.[2]

The intervening claimants contend that the MR. ED ceased to be a "vessel of the United States" when it was sold on June 17, 1965, because the sale was not registered. They urge that therefore the mortgage signed on June 21, 1965 was not a preferred ship mortgage then and that it did not become one thereafter when it was registered. They draw support for this argument from 19 C.F.R. § 3.32(a), which provides in part:

> " * * * when a documented vessel is sold or transferred in whole or in part to a citizen, such vessel shall not

1. "A valid mortgage which at the time it is *made* includes the whole of any *vessel of the United States* * * *." (Emphasis added) is considered to be a preferred ship mortgage. 46 U.S.C.A. § 922.

2. Sequence of events.

| | | Dated | Recorded |
|---|---|---|---|
| 1. | Ordinary mortgage granted by National | September 20, 1960 | October 5, 1960 |
| 2. | National mortgage satisfied | June 17, 1965 | July 13, 1965 |
| 3. | Sale by National to Heller | June 16, 1965 | July 13, 1965 |
| 4. | Sale by Heller to J & M Equipment | June 17, 1965 | July 13, 1965 |
| 5. | Preferred mortgage granted by J & M Equipment | June 21, 1965 | July 13, 1965 |

be deemed a vessel of the United States until documented anew." [3]

■ The provision on which the intervenors rely is based on Section 39 of the Certificates of Registry Act. That act deals primarily with the requirements for the registry of ownership. The portion of Section 39 which states that a vessel ceases to be deemed a vessel of the United States when it is sold and it is not registered anew is obviously to be read in the context of the purposes of that Act.

■ This argument fails to take into account however the Ship Mortgages Act, adopted in 1920, long after the date of the registry provision and designed as a comprehensive statute covering the effect of ship mortgages. This Act contains a provision which is at least in part opposite in context to Section 39 for Section 911(4) of the 1920 Act provides that:

"The term 'vessel of the United States' means any vessel documented under the laws of the United States and such vessel shall be held to continue to be so documented until its documents are surrendered with the approval of the Secretary of Commerce; * * *."

The history of the Ship Mortgages Act of 1920 is traced in Gilmore & Black.[4] Prior to its adoption, there was no way to foreclose a mortgage on a ship in admiralty, nor could the debt evidenced by it be sued on in admiralty. This meant that in any foreclosure proceeding the ship was sold subject to all maritime liens, for these liens could be executed only by the Admiralty Court. Nor was the existence of the mortgage a bar to the creation of subsequent liens. Hence, in most situations, a mortgage on a ship gave little security to its holder.

■ The Ship Mortgages Act was designed to afford greater security to the holders of mortgages on ships by granting them the right to proceed in admiralty and by giving the mortgage a status which preferred it over all claims against the vessel except preferred maritime liens and expenses and fees allowed and costs fixed by the court. Naturally the economic interests adversely affected by the Act—the materialmen whose liens were subordinated—were opposed to it. Nonetheless its passage makes clear the Congressional intent to grant the mortgagee preferential status if he but complies with the requirements of the Act.

It is conceded that, if the present mortgage had been signed on July 13, 1965, and recorded the same day, it would have been a preferred ship mortgage. The defect alleged to be fatal is that it was signed on June 21, 1965.

A similar issue was presented in Jackson v. Inland Oil & Transport Co., 5 Cir., 1963, 318 F.2d 802. Although the Jackson case did not concern a preferred ship mortgage, the question of whether the vessel was "a vessel of the United States" in circumstances otherwise similar to those presented here was raised.

The Jacksons owned a vessel which had been enrolled on February 9, 1954. They executed a bill of sale to Gulf Transportation on April 26, 1955. On the same date, Gulf granted a mortgage to the Jacksons to secure the purchase price. On May 4, 1955, a prior existing mortgage was satisfied of record in the office of the Collector of Customs. On May 17, 1955, the bill of sale and the April 26th mortgage were recorded, and the vessel re-enrolled in Gulf's name. Section 921(a) of the Ship Mortgages Act, 1920, provides:

"No sale, conveyance, or mortgage which, at the time such sale, conveyance, or mortgage is made, includes a vessel of the United States, or any

---

3. This provision is based on 46 U.S.C.A. § 39 which provides in part: "Whenever any vessel, which has been registered, is * * * sold or transferred to a citizen of the United States * * * the vessel shall be registered anew * * * otherwise she shall cease to be deemed a vessel of the United States."

4. Gilmore & Black, The Law of Admiralty, 1957, p. 568.

portion thereof, as the whole or any part of the property sold, conveyed, or mortgaged shall be valid, in respect to such vessel, against any person other than the grantor or mortgagor, his heir or devisee, and a person having actual notice thereof, until such bill of sale, conveyance, or mortgage is recorded in the office of the collector of customs of the port of documentation of such vessel, as provided in subsection (b) of this section."

The Jacksons' mortgage was not valid unless the vessel was a "vessel of the United States" and was therefore entitled to the benefit of § 921, since the mortgage was not recorded in the manner prescribed by Texas state law.

Inland Oil & Transport Company made the same argument that the intervenors are making here: the vessel's enrollment collapsed on April 26, 1965, the date of the sale, by virtue of 19 C.F.R. § 3.32(a). The Court said:

"To this technical and narrow contention there are at least three answers. First, the U. S. Customs Abstract shows the date of both instruments as April 26. Each must have been acknowledged before it was admitted to record. 46 U.S.C.A. § 926(b); 19 C.F.R. § 3.33(g). There is no evidence in the record to show that the acknowledgment of the Bill of Sale was taken at an earlier time than the acknowledgment of the mortgage. Second, the bill of sale and purchase money mortgage were obviously intended by the parties to be 'made' simultaneously, and the cases relied on by Inland are not applicable on their facts. Third, the Three Jacks had not only been previously enrolled, but was covered by a mortgage to The First National Bank of Angleton which had been recorded in the customs office on December 6, 1954, and was not satisfied of record until May 4, 1955, when the mortgage to the Jacksons was acknowledged. It is true that

The Susana, note 2 supra, refers particularly to a preferred mortgage ([The Susana,] 2 F.2d [410] 415, 416), but in view of 46 U.S.C.A. § 921, quoted supra, we think that an ordinary mortgage is no less protected by the provisions of 46 U.S.C.A. § 840."

On rehearing the court added:

"One comment seems appropriate. Appellee insists that 46 U.S.C.A. § 840 'deals only with sales and mortgages of vessels to foreign nationals during periods of war and national emergencies, as its reference to 46 U.S.C. 835 clearly shows.' We do not pass upon that insistence because 46 U.S.C.A. § 911(4) is not so limited, and provides in the same language that 'such vessel shall be held to continue to be so documented until its documents are surrendered with the approval of the Secretary of Commerce.'"

The circumstances recited in the Court's first two remarks are not present here. But here, as in the Jackson case, the vessel had not only been previously enrolled, but was covered by a recorded mortgage at the time of the sale and the recorded mortgage was not satisfied of record until the date when the new sale was enrolled.

The MR. ED was enrolled in the name of National Leasing in 1960, before the sale to Heller. The ordinary mortgage granted by National was not cancelled of record until July 13, 1965, the same day the vessel was re-enrolled in the name of J & M. Thus, applying the rule of the Jackson case to the facts in this case we conclude that the MR. ED continued to be a "vessel of the United States" within the meaning of the Ship Mortgages Act after the sale by National to Heller and by Heller to J & M.

The Lincoln Land [5] case cited by the intervenors is not inconsistent with this result. In that case, the libelants brought a proceeding in rem to enforce a mortgage covering the steamship Lincoln Land. On March 6, 1922, Bertha

5. D.C.Mass., 1924, 295 F. 358.

Daly had sold The Lincoln Land to the libelants. A new certificate of enrollment was never issued to the new owners, although the sale was recorded on June 21, 1922. On the same date, the libelant executed a bill of sale of the steamship to Indian Navigation. A purchase money mortgage was given back to the libelants. The bill of sale and mortgage were recorded on June 22, 1922. The court held, on rehearing, that The Lincoln Land was not then a "vessel of the United States." In commenting on § 911(4) the court said "that the provisions regarding continuation of documentation apply only to vessels subject to a valid preferred mortgage." The rationale given by the court was:

"If these provisions of subsection B (4) [911(4)] are not to be confined to vessels which at the time of conveyance are subject to a preferred mortgage, they would work a complete undermining of the whole structure of the vessel law of the United States. Outstanding documents would continue in force, regardless of the number of successive conveyances or of the citizenship of the successive owners. Only by so limiting these provisions can they be brought into harmony with the system of statutory law of long standing, which relates to vessels engaged in foreign and domestic commerce."

The court therefore implied that an unregistered conveyance of a vessel subject to a preferred ship mortgage would not cause the registry to collapse if the vessel were subject to a preferred ship mortgage. The Susana,[6] cited in Jackson, follows the holding in The Lincoln Land. There the court said the purpose of § 911(4) is "simply to prevent the transfer, without the consent of a mortgagee, of a mortgagor's title to a vessel covered by a preferred mortgage." The holding in the Jackson case extends the protection of § 911(4) to a vessel covered by an ordinary mortgage.

Since the facts of the instant case are so closely akin to those presented in the Jackson case, we are not required to pass on the argument advanced by counsel for the libelant that the Jackson case removes the restrictive interpretation placed on § 911(4) by The Lincoln Land and Susana.[7]

▪ A preferred ship mortgage is not valid against third persons until it is recorded in the office of the Collector of Customs.[8] Since the mortgage in this case was not recorded until July 13, 1965, the intervening claimants are given five days to file affidavits describing those maritime liens which arose before July 13, 1965. Should such affidavits be filed and should counsel be unable to agree on the ranking of the liens, the matter of ranking will be set down for determination on motion. If such affidavits are not filed, the Clerk shall prepare a judgment for the libelant in the amount of the net proceeds in the registry of the court and they shall be disbursed to him.

---

6. 4 Cir., 1924, 2 F.2d 410.

7. It might be noted that The Fort Orange, S.D.N.Y., 1933, 5 F.Supp. 833, in its factual context, does depart slightly from The Lincoln Land and Susana. In The Fort Orange the vessels were sold to the mortgagor on May 5, 1926. Within a few minutes after acquiring title, the mortgagor executed a mortgage covering those vessels. An hour or so following the completion of the sale and mortgage, they were recorded in the office of the collector of customs. A literal interpretation of Lincoln Land and Susana would invalidate the mortgage, because the moment the sale was completed the vessels were no longer vessels of the United States since they were not previously covered by a preferred mortgage. But the court decided otherwise, stating that the events "should be treated as having taken place simultaneously."

19 C.F.R. § 3.33(b) provides in part that "No such instrument [bills of sale and mortgages] shall be accepted for recording * * * unless the vessel affected is documented as a vessel of the United States or will be so documented substantially simultaneously with the recording of the instrument."

8. 46 U.S.C.A. § 921. See also 46 U.S.C.A. § 953(a).