### THE FAVORITE.

### THE HOOK MOUNTAIN.

### THE BEAR MOUNTAIN.

#### No. 238.

Circuit Court of Appeals, Second Circuit.

June 13, 1941.

Before L. HAND, SWAN and AUGUSTUS N. HAND, Circuit Judges.

Crowell & Rouse, of New York City (E. Curtis Rouse and George L. Varian, both of New York City, of counsel), for intervenor-appellant.

Laughlin, Gerard, Bowers & Halpin, of New York City (George S. Brengle, John L. Quinlan, and Bigham, Englar, Jones & Houston, all of New York City, of counsel), for libellant-appellee.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from a final decree in admiralty holding a mortgage covering three steamships, made on December 24, 1929, to secure an indebtedness to the Corn Exchange Bank Trust Company, which was due on April 1, 1930, superior in priority to the maritime lien of Tietjen & Lang Dry Dock Company for repairs to one of the vessels, the Bear Mountain. The repairs were made eight years after the expiration of the date of maturity of the mortgage, which was endorsed on the vessel's documents. The mortgage was recorded in the New York Custom House and thereafter endorsed upon the documents as a preferred ship's mortgage under the Act of 1920, 46 U.S.C.A. § 911 et seq. No exten-

sion of the date of the maturity of the mortgage was ever made, recorded or endorsed. The mortgage provided that failure to pay it punctually on April 1, 1930, would result in a default and render it immediately enforceable. The mortgage was not paid off at maturity but the principal of $100,000 had been reduced to $79,000 which, with interest due at the date of the decree, amounted to $83,732.46. No certificate of partial discharge was ever made, recorded or endorsed, and no steps to foreclose were taken until March, 1939, when the present libel of foreclosure was filed in the District Court by the Corn Exchange Bank Trust Company. The cause came on for trial before Judge Conger, who held that the mortgagee was entitled to priority over the maritime lien of Tietjen & Lang Dry Dock Company and dismissed the intervening petition of the latter and granted the libellant judgment against McAllister Navigation Company, Inc., which had executed the bond secured by the mortgage, for the difference between the indebtedness due and the amounts realized through the foreclosure sale.

Tietjen & Lang Dry Dock Company has appealed from the decree on the ground that its maritime lien for repairs is superior to the lien of libellant's mortgage. In our opinion the decree of the District Court granting priority to the mortgage was right and should be affirmed.

The appellant contends that its lien is superior because: (a) the priority given the mortgage by the Act of 1920 expired on the date of maturity upon the analogy of the rule applicable to bottomry bonds; (b) the priority of the mortgage was lost by laches, due to delay in foreclosure.

The claim that the priority of the lien of a preferred mortgage conforming to the provisions of the Merchant Marine Act, 46 U.S.C.A. § 597 et seq., and recorded as required therein is to be determined by analogies derived from the rules of law applicable to bottomry bonds seems quite out of accord with the purpose of the Act.

In Detroit Trust Co. v. Barlum S. S. Co., 293 U.S. 21, 38 et seq., 55 S.Ct. 31, 36, 79 L.Ed. 176, the Supreme Court remarked that the declared purpose of the Act was "to provide for the promotion and maintenance of the American merchant marine", that: "The report of the Senate Committee on Commerce pointed out that 'mortgage security on ships' was 'practically worthless'; that it was proposed to 'make it good except as to certain demands that should be superior to everything else, such as wages'; and that it was desired to have 'our people and capital interested in shipping and shipping securities.'" The court went on to say: "The bill, with this purpose, was developed in conference. The managers on the part of the House of Representatives, in their statement accompanying the report of the Committee of Conference, observed that by the enlarged provisions of the bill 'the mortgagee under a mortgage upon a vessel of the United States is made more secure in his interest in the vessel than he is under existing admiralty law,' and, referring to the plan of 'creating a preferred mortgage,' added that 'the preferred status arises upon the recording of the mortgage as a preferred mortgage and its indorsement upon vessel's documents.'"

The decision in Detroit Trust Co. v. Barlum S. S. Co., 293 U.S. 21, 55 S.Ct. 31, 41, 79 L.Ed. 176, marked a great advance by the admiralty courts of the United States in the field of their jurisdiction. The Chief Justice, who wrote the opinion, said near its close: "The authority of the Congress to enact legislation of this nature was not limited by previous decisions as to the extent of the admiralty jurisdiction. We have had abundant reason to realize that our experience and new conditions give rise to new conceptions of maritime concerns."

In view of the foregoing and of the broad purposes of the Merchant Marine Act it is entirely clear that the analogy of bottomry bonds cannot control its provisions if they in terms give the libellant's mortgage priority over the maritime lien for repairs. We think the language of the Act renders the priority of the mortgage clear.

U.S.C.A.Title 46, § 922, provides that a preferred mortgage, after recording and endorsement, shall have "the preferred status given by the provisions of section 953".

Section 953 provides:

"(a) When used hereinafter in this chapter, the term 'preferred maritime lien' means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for wages of

the crew of the vessel, for general average, and for salvage, including contract salvage.

"(b) * * * the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court."

U.S.C.A. Title 46, § 951, provides that: "A preferred mortgage shall constitute a lien upon the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by such vessel. Upon the default of any term or condition of the mortgage, such lien may be enforced by the mortgagee by suit in rem in admiralty. * * *"

In the case at bar there was default on the part of the mortgagor through failure to pay the mortgage indebtedness when due. Section 951 contains no requirement that, in order to preserve the preferred status of such a mortgage, the mortgagee must foreclose at maturity or within a reasonable time thereafter, or indeed at any particular time. Accordingly the lien became enforceable, the libel was properly filed and the decree of the District Court in favor of Corn Exchange Bank Trust Company is unassailable.

█ There can be no reason for supposing that ships' mortgages recorded in conformity with the Act of 1920, which was designed to make such securities desirable investments, should be subjected to limitations that would render their enforcement far more difficult and hazardous than that of similar mortgages covering land or chattels. It was plainly the purpose of the Act to make ships' mortgages as available for investment as other securities with which the public is accustomed to deal and thus to render that class of securities attractive which had been unmarketable before.

The intricate reasoning whereby the appellant has attacked the priority of the libellant's mortgage, like the past attacks upon the constitutionality and scope of the Ship Mortgage Act, appears to be an aftermath of the long struggles of the courts of common law and equity to limit the admiralty jurisdiction. Many of the details of this struggle, which lasted for at least 200 years, are related by Professor Andrews in Volume 4, Chapter VIII of his great work on "The Colonial Period of American History" (Yale University Press 1938), where he gives a sketch of the Vice-Admiralty Courts. This fight that

went on in England and its Colonies between the common law and chancery courts and the admiralty judges, and continued in the courts of the states prior to the adoption of the federal constitution, stood in the way of each attempted extension of the jurisdiction of the unpopular maritime courts. As a result there still remains a hesitancy to assert powers under the maritime jurisdiction, as fully as would be natural, and an inclination to await congressional legislation before taking any new steps. This self-limiting tendency has manifested itself in the case of ships' mortgages, contracts to build ships, torts on navigable waters which are not a part of the sea itself, and other similar matters, and has encouraged attempts to retain restrictions of the jurisdiction of the courts of admiralty which, if they should prevail, would impair the value of ships' mortgages and thwart the broad purposes of the Ship Mortgage Act. Doubtless such attempts would hardly have been made in a field where opposition to extensions of jurisdiction was less traditional than that of maritime law. Cf. Penhallow v. Doane, Fed. Cas. No. 10,925, 3 Dall. 54.

█ The appellant argues that the requirement that the date of maturity of the mortgage be entered in the Custom House record and endorsed on the ship's documents limits the time when the security may be enforced and the lien may have priority. This contention seems quite unfounded. The requirement was to enable persons making advances or furnishing repairs to vessels to know when the mortgage matured in order that they might determine whether it was safe for them to risk taking a junior security. When the intervenor in the case at bar contracted to make the repairs the mortgage was already long overdue and the record indicated that its lien was for a larger amount than was in fact owing after the reduction of the principal by payments of about $21,000. In the face of this record we can imagine no prejudice to the intervenor because of the omission of the mortgagee to begin foreclosure sooner than it did.

Appellant's claim that the failure of the mortgagor to file a certificate of part payment pursuant to Section 925 affects the priority of the mortgage cannot be substantiated. That such failure of the mortgagor will impair the right of foreclosure and the priority of the mortgagee is almost fantastic.

The analogy of the mortgage to a bottomry bond is illusory. A bottomry bond ordinarily creates a secret lien. Here the ship's mortgage was recorded in the Custom House and any subsequent lienor could discover it by examining the record. The rule for bottomry bonds that enforcement must be contemporaneous with maturity or shortly thereafter originated because such liens were secret. They should not be allowed to stand in the way of subsequent lienors, having no notice of their existence, any longer than absolutely necessary. What effect R.S. § 4192, 46 U. S.C.A. § 921 note, permitting bottomry bonds to be recorded had upon their enforcement, and whether special diligence in enforcing such bonds was requisite even though subsequent lienors had notice of their existence before giving credit to the vessel, has not been shown. But in any event the rule as to enforcement of bottomry bonds has no effect upon the rights of a preferred ship's mortgage made and filed in conformity with the provisions of the Ship Mortgage Act.

Appellant's final contention that the mortgagee is barred from foreclosure by laches has no merit. The mortgagor not only reduced the principal but kept up the payment of interest until shortly before the libel was filed. There surely was no showing of laches affecting libellant's cause of action or claim of priority.

Decree affirmed with costs to appellee.