634 F.2d 952
 The MERCHANTS NATIONAL BANK OF MOBILE, a National Banking
Association, Plaintiff-Appellee,
v.
The Vessels WARD RIG NO. 7, OFFICIAL NO. 547149 et al., Defendants,
J. D. Ward et al., Intervenors-Appellants.
 No. 78-3204.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 22, 1981.
 
 Milling, Benson, Woodward, Hillyer & Pierson, Neal D. Hobson, John T. Nesser, III, Henry A. King, New Orleans, La., for J. D. Ward, Waseco Chemical, Elpac, Inc. and F&S Boat Co. Div.
 Hoppe, Kelly & Dupepe, Henry B. Hoppe, Metairie, La., for Oilfield Repair & Specialty Co.
 Chaffe, McCall, Phillips, Toler & Sarpy, James J. Gillespie, Jr., New Orleans, La., for Service Engineering Co., Inc.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before TJOFLAT, POLITZ and HATCHETT, Circuit Judges.
 POLITZ, Circuit Judge:
 
 
 1
 This appeal poses the question whether three mortgages held by the Bank of Mobile are entitled to the status of preferred ship mortgages under the Ship Mortgage Act, 1920, 46 U.S.C. §§ 911-984, and thus prime the liens and claims of appellants. The district court adopted the thorough and comprehensive findings and recommendations of the magistrate and upheld the validity and primacy of the mortgages. We affirm. We also hold that 46 C.F.R. § 67.45-1 (1979) is invalid.
 
 Context Facts
 
 2
 This case involves what appears to be a typical sale and loan security transaction, with a relatively routine disbursement of the sale proceeds to the vendor and creditors of the vendor who claim an interest in the property involved. The litigation is precipitated by the language of a regulation, a four-day variance in the mortgage maturity date, a discrepancy in the due date as set forth in the mortgages and underlying notes, the wording of affidavits, and the sums involved, all with a synergistic effect.
 
 
 3
 On November 27, 1974, Coastal International Drilling Corporation (Coastal) purchased from Ward Drilling Company, Inc. (Ward), three drilling rigs identified as Ward Rigs Numbers 7, 8 and 11, and on that date executed a mortgage on each vessel in favor of Merchants National Bank of Mobile (Merchants Bank) to secure a loan of $1,400,000. The loan proceeds were used to pay Ward's outstanding debts, including prior mortgages, with the balance being paid to Ward.
 
 
 4
 The bills of sale, mortgages and related papers needed to effect the sale, loan transactions, loan security and transfer of vessel registrations were executed simultaneously. Each mortgage to Merchants Bank contains Coastal's Affidavit of Good Faith which states: "There are no liens, encumbrances, charges or mortgages outstanding against said vessel, other than the lien of the foregoing mortgage." At the same time the Merchants Bank mortgages were executed, Coastal executed another set of mortgages in favor of International Offshore Drilling Corporation (International) which also contains similar Affidavits of Good Faith.
 
 
 5
 On November 27, 1974, Coastal made application to the United States Coast Guard for vessel registry documents, known as Consolidated Enrollments and Licenses, for the three vessels, all of which were engaged in coastwise navigation both before and after the sale. On that date the ship mortgages on Ward Rigs Numbers 7 and 8 were received and recorded by the Coast Guard. The mortgage on Number 11 was received and recorded on November 29, 1974, on which date a Consolidated Enrollment and License was issued for each vessel. Also on that date, the mortgages in favor of Merchants Bank were endorsed on each vessel's documents, reflecting the mortgage maturity date of November 27, 1981, as noted on the top right corner of the first page of the mortgage. The Merchants Bank mortgages were received, recorded and endorsed prior to the filing of the mortgages in favor of International.
 
 
 6
 The mortgage indebtedness was payable in installments as set forth in a schedule detailed on the first page of the mortgage. The schedule provided for 28 consecutive quarterly payments, with the first installment payable on March 1, 1975. Extension of this payment schedule reflects that the final quarterly payment would have come due on December 1, 1981. The mortgages to Merchants Bank refer to a promissory note executed by Coastal to evidence the $1,400,000 debt. The original promissory note contained an error in the amount and was replaced by a second note which contained an error in the number of payments (84 instead of 28 quarterly payments). The mortgage notes were not filed with the Coast Guard Vessel Documentation Office and, until the foreclosure, the discrepancy was not known by any of appellants. The mortgages refer to and incorporate by reference a Loan Agreement which was not attached. The loan involved was for seven years from November 27, 1974, and was to be repaid fully within that period.
 
 
 7
 Upon default, Merchants Bank foreclosed and the vessels were seized on July 26, 1976, and sold at public auction on November 30, 1976, for $425,000.
 
 The Challenge
 
 8
 Appellants submit three contentions on appeal: (1) a vessel which has been sold, and not yet re-registered, does not qualify as a "vessel of the United States" for purposes of the Ship Mortgage Act, (2) a mortgage with two different maturity dates, both of which vary from the maturity date on the underlying promissory note, does not meet the requirements of the Ship Mortgage Act, and (3) a false affidavit does not meet the requirements of the Ship Mortgage Act.
 
 The Ship Mortgage Act
 
 9
 Before addressing the question of the validity of the Merchants Bank mortgages, we briefly review the history of the Ship Mortgage Act, 1920.[1] Prior to passage of this Act it was not possible to foreclose on a ship mortgage in admiralty. Bogart v. The John Jay, 58 U.S. (17 How.) 399, 15 L.Ed. 95 (1854). In foreclosure proceedings the ship was sold subject to all maritime liens, including those arising after the mortgage. This inferior status provided the mortgage holder with little security, a fact which adversely affected investor interest.
 
 
 10
 The primary aim of the Ship Mortgage Act was to stimulate private investment in the shipping industry by offering greater protection to investors.[2] Mortgagees were granted the right to proceed in admiralty with a preferred status over all claims except certain maritime liens and expenses, and fees and costs fixed by the court. The Act was enacted over stiff opposition which largely contributed to adoption of a number of stringent prerequisites which must be satisfied before the preferred ship mortgage status attaches.
 
 
 11
 The requirements for a preferred ship mortgage are contained in 46 U.S.C. § 922(a), which provides in pertinent part:
 
 
 12
 A valid mortgage which at the time it is made, includes the whole of any vessel of the United States ..., shall, in addition, have, in respect to such vessel and as of the date of the compliance with all the provisions of this subsection, the preferred status given by the provisions of section 953 of this title, if-
 
 
 13
 (1) The mortgage is endorsed upon the vessel's documents in accordance with the provisions of this section;
 
 
 14
 (2) The mortgage is recorded as provided in section 921 of this title, together with the time and date when the mortgage is so endorsed;
 
 
 15
 (3) An affidavit is filed with the record of such mortgage to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel;
 
 
 16
 (4) The mortgage does not stipulate that the mortgagee waives the preferred status thereof; and
 
 
 17
 (5) The mortgagee is ... a citizen of the United States....
 
 Vessels of the United States
 
 18
 Appellants contend that the three rigs are not "vessels of the United States" within the intendment of the Ship Mortgage Act. They contend that the moment Ward signed the bills of sale over to Coastal, the vessels ceased to be vessels of the United States and, thereafter, when the mortgages at issue were signed they did not cover vessels of the United States as required by the Act. Appellants' argument relies on a literal reading of the regulation currently found at 46 C.F.R. § 67.45-1 (1979) which provides:
 
 
 19
 Vessel ceases to be a vessel of the United States until documented anew.
 
 
 20
 Except as stated in Subpart 67.55, when a documented vessel is sold or transferred in whole or in part to a citizen, such vessel shall not be deemed a vessel of the United States until documented anew.
 
 
 21
 Subpart 67.55 involves sales of documented vessels which are consummated abroad. It is not relevant to the present inquiry.
 
 
 22
 The definitions which are applicable to the Ship Mortgage Act are found in 46 U.S.C. § 911. Of particular import is the definition assigned to vessel of the United States:
 
 
 23
 (4) The term "vessel of the United States" means any vessel documented under the laws of the United States and such vessel shall be held to continue to be so documented until its documents are surrendered with the approval of the Secretary of Transportation.
 
 
 24
 The term "documented," also pertinent, is defined in § 911(2) as meaning:
 
 
 25
 registered or enrolled or licensed under the laws of the United States, whether permanently or temporarily.
 
 
 26
 In general, "registry" applies to vessels in foreign commerce while "enrollment" applies to vessels in coastwise navigation. The three Ward rigs were enrolled with the Coast Guard by Ward and applications for new enrollment were filed by Coastal on the same date it acquired the rigs from Ward.
 
 
 27
 The facts material to resolution of this dispute were found by the district court. We find nothing to indicate that these findings are clearly erroneous, Fed.R.Civ.P. 52(a); indeed, we are convinced that these findings are clearly not erroneous. For purposes of clarity we capsulate the following events which occurred on November 27, 1974: (1) Ward executed acts of sale of the vessels to Coastal, (2) prior mortgages and claims against the vessels were satisfied and cancelled, (3) application was made by Coastal for a Consolidated Enrollment and License for each vessel, (4) Coastal executed a mortgage on each vessel including the Affidavits of Good Faith, and (5) the mortgages on Ward Rigs Numbers 7 and 8 were delivered to the Coast Guard and recorded. On November 29, 1974, the mortgage on Rig Number 11 was delivered and recorded and a Consolidated Enrollment and License issued to Coastal for each of the three vessels.
 
 
 28
 We conclude that the effective date of documentation is the date a proper application is received by the Coast Guard. Parenthetically we note that under 46 U.S.C. § 921(a), a sale, conveyance or mortgage is effective as to third persons, from and after the time the instrument is recorded in the office of the collector of customs of the port of documentation of the vessel. This section prescribes that, inter alia, the time and date of reception of the instrument are to be recorded for the instrument has extra-party legal effect as of that moment.
 
 
 29
 It would belie reason to conclude that an application for documentation has no effect until acted on by the authorities. We are convinced that when the vessel is documented the action is effective retroactive to the date and time the application was filed. We further conclude that the events which transpired on November 27, 1974, absent a showing to the contrary, took place simultaneously and, as necessary within the simultaneous-action setting, were properly sequenced to give validity to the acts. These parties were responsibly proceeding to consummate a legitimate, commercial transaction. Ward wished to sell, Coastal wished to buy and needed to borrow funds which Merchants Bank was prepared to loan provided proper, valid security was received. Coastal wanted valid, unencumbered title with all claims against Ward paid in full. The parties set out to accomplish their purposes in a legal manner. We hold that they did so. See The Enos, 24 F.Supp. 387 (W.D.Wash.1938); The Fort Orange, 5 F.Supp. 833 (S.D.N.Y.1933).
 
 
 30
 To arrive at the conclusion that the parties acted legally and appropriately in the sale/mortgage/documentation of the vessels we must consider the validity of the regulation which is at the core of appellants' objection, 46 C.F.R. § 67.45-1. The regulation provides that upon the execution of the acts of sale by Ward the three vessels instantaneously lost their status as vessels of the United States, a status regained two days later when the Coast Guard issued the new documentation papers. For the intervening two days they were as naught. That rationale not only is contrary to reason, but also is inconsistent with the statutory scheme.
 
 
 31
 Under 46 U.S.C. § 911(4) a vessel documented under the laws of the United States is a "vessel of the United States" and has that status until the documentation is surrendered with approval. Reflective of the continuation of status after sale is the provision contained in 46 U.S.C. § 39, requiring that if a vessel is sold it must be registered by the new owner, otherwise "she shall cease to be deemed a vessel of the United States." The obvious statutory intent is to allow a reasonable period of time for re-registry, without lapse of status as a vessel of the United States if the application for documentation is made by the new owner within that time. The regulation goes beyond those parameters. In Manhattan Co. v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936), the Supreme Court declared:
 
 
 32
 The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law-for no such power can be delegated by Congress-but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity.
 
 
 33
 We hold that 46 C.F.R. § 67.45-1 goes beyond the pale of statutory authority and is null and void. Under controlling statutory provisions, unfettered by the invalid regulation, when the mortgages to Merchants Bank were executed, the rigs were vessels of the United States within the meaning of the Ship Mortgage Act.
 
 The Maturity Date Debate
 
 34
 The magistrate's observations and conclusions on the maturity date dispute are patently correct. We adopt them as our own:
 
 
 35
 "There is a discrepancy in each mortgage with regard to the maturity date. Although the right hand corner states a maturity date of November 27, 1981, the payment schedule on the same page calculates out to a maturity date of December 1, 1981. There is a four-day discrepancy (in a period of 2,556 days). It is easy to comprehend how such a minor error could have occurred. There was copious testimony at trial that this was to be a seven-year loan. Since the loan was to be paid out in quarterly installments, the correct number of installments on a seven-year loan would be twenty-eight. The first installment was due on March 1, 1975, with subsequent installments becoming due on the first day of each third month thereafter. The final payment would, therefore, become due on December 1, 1981. The closing of the loan transpired on November 27, 1974. Seven years beyond the date of the closing of the loan would be November 27, 1981. To be entitled to preferred status, mortgages first must be valid mortgages and also must be endorsed upon the vessels' documents. 46 U.S.C. §§ 921 and 922. It has been alleged that this discrepancy was fatal to the validity of the mortgages and, further, that the conflicting maturity dates resulted in an improper endorsement of the mortgages on the ships' documents. The ships' documents reflect a maturity date of November 27, 1981.
 
 
 36
 "The minor four-day discrepancy in the maturity dates on the face of the mortgages is not fatal to the validity of the mortgages, nor did the discrepancy preclude proper endorsement on the vessels' documents. The parties intended there to be a seven-year loan with the final payment coming due on November 27, 1981, so that there was no ambiguity as to them. Title 46 U.S.C. §§ 921(b)(5) and 922(c)(3) require that the maturity date of a mortgage be recorded by the Collector of Customs in certain books and that the maturity date be endorsed on the vessel's documents. The purpose of these requirements is to enable potential creditors and potential lienholders to determine when the preferred mortgage matures so they can determine whether or not to advance credit. The Favorite, 120 F.2d 899, 902 (2d Cir. 1941). In Port Welcome Cruises, Inc. v. S/S Bay Belle, 215 F.Supp. 72, aff'd 324 F.2d 954 (4th Cir. 1963), which involved a sixteen-day discrepancy in the maturity date between a note and a mortgage, the Court held that the earlier date stated in the mortgage was controlling. In that case, the Court emphasized that the legislative purpose in enacting 46 U.S.C. 921(b)(5) and 922(c)(3) was to put potential lienholders on notice as to when senior liens matured. Here, the endorsements clearly indicated the maturity date of the mortgages and removed any doubt as to when final payment was due. Moreover, the minor four-day discrepancy in the mortgages undoubtedly lacked importance insofar as lienholders were concerned since the maturity date was so far into the future."
 
 
 37
 To conclude otherwise on this issue would be the ultimate in exulting form over substance. This we decline to do.
 
 
 38
 Appellants also argue that the mortgages cannot be valid preferred ship mortgages because there is a discrepancy between the mortgages and the underlying promissory note and an error in that note. This argument is devoid of merit. We are examining the validity of the ship mortgage which does not require a promissory note, only a debt which is being secured. As we pointed out in Tropicana Shipping, S.A. v. Empresa Nacional "Elcano", 366 F.2d 729, 733 (5th Cir. 1966), where the notes described in the mortgage did not exist:
 
 
 39
 As to this issue it is well established that the validity of a mortgage is dependent only on the existence of a debt actually secured by the mortgage and not on the description of the debt contained in the instrument.
 
 
 40
 There is no question of the existence and viability of the debt from Coastal to Merchants Bank which is being secured by the mortgages. Technical aspects about the note or notes evidencing that obligation are not pertinent to the issue of the validity of the preferred ship mortgages as presented in this litigation.
 
 The Affidavits of Good Faith
 
 41
 The essence of this challenge by appellants is that the assertion in the affidavits given in conjunction with the Merchants Bank mortgages is incorrect and therefore the mortgages are invalid. The argument is that: (1) either the pre-existing Ward mortgages were still in existence, or (2) perhaps the mortgages given to International were signed first.
 
 
 42
 Both of these contentions are without merit. The evidence clearly establishes the intent and purpose of the parties to legally conclude this transaction. We have reviewed in detail, and set forth seriatim above, what transpired on November 27, 1974, and the presumption we draw from our understanding of the events of that day. The simultaneity of the events, and the proper legal sequencing resulting from our presumption, obviate any claim that the affidavits were incorrect. We underscore that there is not the first breath of fraud or purposeful intent to evade or to mislead anyone extant in this record. Under those circumstances, we find and hold that the giving of the affidavits in this closing transaction was done properly and legally.
 
 
 43
 The district court is AFFIRMED.
 
 
 
 [1]
 See generally G. Gilmore & C. Black, Jr., The Law of Admiralty (2d ed. 1975)
 
 
 [2]
 See Walter E. Heller & Company v. M/V Mr. Ed., 270 F.Supp. 830 (E.D.La.1967); Gilmore & Black, supra note 1, at 688-91