## In re McLEAN INDUSTRIES, INC., et al., Debtor.

### Bankruptcy No. 86 B 12238–41.

United States Bankruptcy Court, S.D. New York.

July 29, 1987.

See also, Bkrtcy., 76 B.R. 291.

Milbank, Tweed, Hadley & McCloy by Alan W. Kornberg, Stephen Shimshak, Robert Drain, New York City, for debtors-in-possession.

Weil, Gotshal & Manges by Corinne Ball, Jacqueline Taubes, New York City, McCutchen, Black, Verleger & Shea by Sheldon A. Gebb, Los Angeles, Cal., for Prudential Ins. Co. of America.

White & Case by Allan L. Gropper, New York City, for the Official Unsecured Creditors Committee.

Gilmartin, Poster & Shafto by Robert L. Poster, William K. Sheehy, New York City, Special Admiralty Counsel for debtors-in-possession.

Latham & Watkins by Robert J. Rosenberg, Freehill, Hogan & Mahar by Nathan Bayer, New York City, for General Elec. Credit Corp.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Before us is a motion by Prudential Insurance Company of America ("Prudential"), a creditor, for relief from the auto-

matic stay, imposed by Section 362 of title 11 of the United States Code (the "Bankruptcy Code"), which would permit Prudential to foreclose on certain vessels that are the subject of alleged first preferred ship mortgages in favor of Prudential and require the Debtor to bring their challenge to those mortgages in the admiralty courts.

## I.

United States Lines, Inc. ("USL" or "Debtor"), United States Lines (S.A.), Inc. ("SA"), McLean Industries, Inc. ("McLean"), and First Colony Farms, Inc. ("First Colony") each filed a petition with this Court on November 24, 1986 seeking relief under Chapter 11 of the Bankruptcy Code. On the petition date (the "filing date"), this Court consolidated the Chapter 11 cases of USL, SA, McLean and First Colony for procedural purposes only.

Prior to the filing, USL and SA had operated one of the largest container lines and cargo shipping companies in the world. They retained possession of their assets as provided for in § 1107 and § 1108 of the Bankruptcy Code. Both are in the process of winding up their shipping operations in a manner they believe will garner the most benefit for their creditors.

The facts pertaining to the instant motion are straight-forward and are hardly complex or technical. Prudential, USL, McLean and First Colony were parties to a Note Purchase Agreement and Financing and Security Agreement, dated April 12, 1978 (hereinafter the "1978 Debt Agreements"), pursuant to which USL incurred an indebtedness (principal amount of $126,859,753.54) to Prudential (the "1978 Debt"). Apparently, the outstanding principal amount of the 1978 debt on the filing date was $92,885,000. In conjunction with the 1978 Debt Agreements, USL, as owner/mortgagor, and Prudential, as mortgagee, entered into three duly perfected first preferred ship mortgages dated April 12, 1978, collateralized by eight vessels known as the Lancers. These mortgages were recorded in the Documentation Office of the Officer-in-Charge, Marine Inspection, United States Coast Guard, New York,

New York, on April 12, 1978 in Book PM/331 at pages 1, 2, and 3 (collectively, the "1978 First Preferred Ship Mortgages").

In April 1983, USL borrowed approximately $114,000,000 (the "1983 Debt") from Prudential and General Electric Credit Corporation ("GECC"). The 1983 Debt was secured, *inter alia*, by second ship mortgages on each of the Lancers granted by USL, as owner, to United States Trust Company of New York, as indenture trustee, for the benefit of Prudential and GECC (the "Second Ship Mortgages"). At the same time, the 1978 First Preferred Ship Mortgages were amended and superseded by a duly perfected first preferred ship mortgage recorded in the Documentation Office of the Officer-in-Charge, Marine Inspection, United States Coast Guard, New York, New York, on April 21, 1983 in Book PM/368 at page 41 (the "First Ship Mortgage").

In 1986, the First Ship Mortgage was amended by a document called Amendment No. 1 to the First Preferred Ship Mortgage ("Amendment No. 1") dated April 14, 1986. In addition to adding several covenants by USL, Amendment No. 1 reflected a reduction in USL's outstanding debt, stating:

> As of January 1, 1986 there remained outstanding $92,885.00 in aggregate principal amount of the 1983 Company Notes....

> . . . .

Section 33 of the Original Mortgage is hereby amended to read in its entirety as follows:

> "For the purpose of this mortgage and the endorsement thereof on the marine document of the vessel as required by the Ship Mortgage Act, 1920, as amended, (a) the total amount is $92,885.00 (the aggregate principal amount of 1983 Company Notes and Additional Notes, if any, now outstanding) and interest and performance of mortgage covenants, and (b) the date of the maturity is October 15, 1991 and (c) the discharge amount is the same as the total amount."

Contemporaneously with Amendment No. 1, several other ship mortgages securing the 1983 Debt were apparently amended in similar fashion.

As required by the Ship Mortgage Act of 1920, 46 U.S.C. § 921(a) (1968), Amendment No. 1 was recorded with the Documentation Office of the Officer-in-Charge, Marine Inspection, United States Coast Guard, at New York, New York, on April 15, 1986 in Book Volume PM/419 at page 103.

Certificates of documentation and abstract of title for each of the eight Lancers (Exhibits F (1)–(8), G(1)–(8)) were prepared and recorded. In each of these documents, the principal amount of the outstanding debt to Prudential, pursuant to the First Ship Mortgage, is stated to have been "reduced to $92,885.00" from $126,859,753.54.

Accordingly, the Debtor and Official Unsecured Creditors Committee (the "Creditors Committee") assert that Prudential's First Ship Mortgage is not valid beyond the perfected amount of $92,885.00. Notwithstanding the statement of Amendment No. 1 reproduced above, Prudential claims that the principal amount of outstanding debt was erroneously recorded and endorsed by the Coast Guard as $92,885.00. It asserts that it maintains a First Preferred Ship Mortgage in the principal amount of $92,-885,000, as stated in an exhibit to Amendment No. 1, which indicates in its preliminary statement that "[a]s of January 1, 1986 there remained outstanding $92,885,-000 in aggregate principal amount of the 1983 Company Notes."

Prudential's motion seeking relief from the automatic stay under Section 362(d) of the Bankruptcy Code initially sought an order permitting it to exercise its remedies in respect to the Lancers and related equipment and proceeds. A preliminary hearing was held on June 4, 1987, and pursuant to § 362(e), a final hearing was set for June 26, 1987. At the final hearing, the automatic stay was continued until after the entry of an order resolving Prudential's motion.

At the final hearing, the mortgage documents were admitted in evidence and the Debtor objected to the motion in full with respect to three of the Lancers on the ground that their sale to Sea-Land Services, Inc. ("Sea-Land"), as part of a package with other assets, was necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). No evidence was presented as to that issue by any party. With respect to the other five Lancers, the Debtor stated its willingness to consent to the entry of an order for relief provided: (i) that the order retained in the bankruptcy court the ability to decide claims that the Debtors might have under 11 U.S.C. §§ 506(c), 544(a), and 551; and (ii) that the order further compel the return of proceeds from the sale of the vessels to this Court for distribution. In response, Prudential agreed that this Court should retain the ability to consider the Debtor's claims under 11 U.S.C. § 506(c) for sums expended with respect to the Lancers, but asserted that the admiralty courts should decide the other issues and distribute the proceeds.

After the close of the final hearing, the Court indicated its preference for evidence on the issue of necessity. Concurrently, the Debtor announced that it had renegotiated their arrangement with Sea-Land to provide merely for charter by Sea-Land of three of the Lancers for a six month period with an option to renew for an additional six month period. After hearing the parties, the Court ordered that the record be reopened for the purpose of taking evidence as to necessity and scheduled a hearing for July 15, 1987. On the day of the hearing, counsel for the Debtor and counsel for Prudential announced that Prudential had conceptually agreed to the charter of three Lancers to Sea-Land and to exclude those three Lancers from the instant motion. It was further agreed that the ultimate disposition of the three vessels would be treated similar to the other five vessels to be foreclosed in various U.S. admiralty courts and that the court should decide the issues raised by the Debtor. That agreement was finalized on the record on July 23, 1987.

Thus, the issues before us are whether the automatic stay is only to be modified so as to retain in the bankruptcy court, rather

than deferring to the admiralty court, (i) the challenge by the Debtors, supported by the Creditors Committee, to the validity under the Ship Mortgage Act of 1920 of Prudential's asserted lien of $92,885,000, in view of the power and status conferred upon debtors-in-possession and trustees by 11 U.S.C. § 544, (ii) the claim that, were Prudential's $92,885,000 lien unperfected, it may be preserved for the benefit of the estate under 11 U.S.C. § 551, and (iii) the ability to distribute the proceeds from the sale of the vessels after they are sold by the admiralty courts.

## II.

As we continue to explore and map[1] the unchartered inlets and bays of maritime bankruptcy much in the manner of Champlain's marking the numerous unknown shoals and landfalls between Port Royale and Cape Cod,[2] it becomes increasingly important to identify the interplay of the bankruptcy and admiralty courts. In this we are not concerned with the desire of creditors that their rights be determined elsewhere or the desire of debtors that their rights be determined in one bankruptcy court. Rather we are concerned with the proper interplay of these systems in the construct of a particular case and in the light of the proper allocation of dispute resolution tasks.

Such concerns are usually addressed under the doctrine of primary jurisdiction. R.J. Pierce, S.A., Shapiro & P.A. Verkuil, *Administrative Law & Process* 208–10 (1985). That doctrine provides that a court with jurisdiction may defer resolution of a technical factual issue to an administrative agency having expertise beyond the normal competence of judges in order to preserve consistency and uniformity in regulation of the business entrusted to that agency. *E.g., Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494–95, 96 L.Ed. 576 (1952); *In re McLean Industries. Inc.*, 70 B.R. 852, 859, 15

B.C.D. 864, 16 C.B.C.2d 645, Bankr.L.Rep. (CCH) ¶ 71,745 (Bankr.S.D.N.Y.1987). Cases such as *Order of Railway Conductors v. Pitney*, 326 U.S. 561, 567, 66 S.Ct. 332, 325, 90 L.Ed. 318 (1946) (intricate dispute between two unions regarding provision of services to bankrupt railroad should have been deferred by railroad reorganization court to Railway Labor Adjustment Board and court should have stayed proceedings before it pending resolution by the Board), *Smith v. Hoboken R.R. Co.*, 328 U.S. 123, 130, 66 S.Ct. 947, 951–52, 90 L.Ed. 1123 (1946) (issue of whether a bankrupt railroad had forfeited track rights should have been deferred by railroad reorganization court to the Interstate Commerce Commission in view of statute requiring commission certificate for abandonment of tracks), *Nathanson v. National Labor Relations Board*, 344 U.S. 25, 30, 73 S.Ct. 80, 83–84, 97 L.Ed. 23 (1952) (liquidation of unfair labor practice claim should have been deferred by bankruptcy court to the NLRB for it to determine the appropriate remedy), and *Gary Aircraft Corp. v. United States of America (In re Gary Aircraft Corp.)*, 698 F.2d 775 (5th Cir.1983) (claims arising from government contract should have been deferred by bankruptcy court to Board of Contract Appeals where claims were highly technical and complex), can be viewed as falling under that doctrine. In the absence of precedent, whether to defer liquidation of a claim to an agency is an issue in the court's "sound discretion." *Nathanson*, 344 U.S. at 30, 73 S.Ct. at 83–84.

Here, however, we are not concerned with the allocation of dispute resolution functions between court and agency. We are, instead, concerned with the degree to which the automatic stay codified in 11 U.S.C. § 362(a) is to be modified to permit Prudential to litigate elsewhere the validity of its lien with a debtor-in-possession, in light of the status and powers conveyed by 11 U.S.C. §§ 544 and 551. In determining

---

**1.** *See In re McLean Industries, Inc. et al.*, 74 B.R. 589, 590, 596 (Bankr. S.D.N.Y.1987); *In re Prudential Lines Inc.*, 69 B.R. 439, 16 C.B.C.2d 383, 15 B.C.D. 445, Bankr.L.Rep. (CCH) ¶ 71,676 (Bankr.S.D.N.Y.1987).

**2.** *See* S.E. Morison, *Samuel de Champlain Father of New France* 71–89 (Little Brown & Co. 1972).

whether to vacate or modify the automatic stay in connection with entering an order for relief from the automatic stay under § 362(d), the bankruptcy court has discretion. *In re McLean Industries, Inc.*, 74 B.R. 589, 602 (S.D.N.Y.1987). In the exercise of that discretion, several considerations obtain.

### A. *Jurisdictional Considerations*

Primary among these considerations is the notion that the bankruptcy court has jurisdiction to adjudicate the validity of the maritime liens asserted by Prudential. *E.g., Morgan Guaranty Trust Co. of N.Y. v. Hellenic Lines*, 38 B.R. 987, 995, 10 C.B.C.2d 1156, Bankr.L.Rep. (CCH) ¶ 69,-752 (S.D.N.Y.1984); *cf. In re Modern Boats, Inc.*, 775 F.2d 619, 620 (5th Cir. 1985). Thus, this is not a case like *Smith v. Hoboken R.R. Co.*, where Congress required affirmative action by an agency, or *In re Prudential Lines Inc.*, 69 B.R. 439, 16 C.B.C.2d 383, 15 B.C.D. 445, Bankr.L. Rep. (CCH) ¶ 71,676 (Bankr.S.D.N.Y.1987), where Congress had enacted an automatic exemption for pre-petition admiralty foreclosure actions brought by the United States Maritime Administration. Instead, this is an issue within the "core" jurisdiction of the bankruptcy courts, for 28 U.S.C. § 157(b)(2)(K) provides that "determinations of the validity, extent, or priority of liens" are core matters.[3]

That this jurisdiction includes determinations pertaining to maritime liens cannot be seriously questioned. *See F.R. Kennedy*, Jurisdictional Problems Between Admiralty and Bankruptcy Courts, 59 Tulane L.Rev.

1183, 1201 n. 96 (1985) (collecting bankruptcy cases where the validity and priority of maritime liens has been determined by bankruptcy courts); *Hellenic Lines*, 38 B.R. at 995. Accordingly, Prudential does not contend that this Court lacks such power or that the admiralty courts have exclusive jurisdiction to determine the validity of a ship mortgage.

This observation might be tempered by the notion that the bankruptcy court lacks jurisdiction to liquidate personal injury claims. *See In re Waterman Steamship Co.*, 63 B.R. 435, 436, 14 B.C.D. 884 (Bankr. S.D.N.Y.1986); 28 U.S.C. § 157(b)(2)(B), (b)(5). In a maritime case, that lack of jurisdiction assumes importance because of the inchoate maritime lien status afforded to seamen's personal injury claims. But the issue here does not involve a debtor's attempt to challenge seamen's liens.[4]

Also of concern is the unfortunate notion that the law has not yet grown to the point where other nations have afforded comity to bankruptcy proceedings, *see McLean*, 74 B.R. at 602 (Bankr.S.D.N.Y. June 10, 1987), and, consequently, have recognized only the decrees of admiralty courts that wipe a vessel clean of liens. *Hellenic Lines*, 38 B.R. at 996. Such an issue might have significance with respect to a foreign lienor not subject to personal jurisdiction. Here, however, Prudential is subject to personal jurisdiction. Thus, any judgment will be binding on it and the estate.

### B. *Nature of the Dispute*[5]

Of more relevance to the allocation of dispute resolution is the proper use of

---

3. As Judge Friendly observed, "There appears to be no doubt that a bankruptcy court can be constitutionally vested with power to resort to its judgment in determining what constitutes satisfaction of the claims of creditors." *In re Penn Central Corp.*, 384 F.Supp. 895, 950 (Regional Rail Reorg.Ct.1974). Numerous precedents indicate the power of the bankruptcy courts, even under the summary jurisdiction of the former Bankruptcy Act, to determine the validity of maritime liens. F.R. Kennedy, *Jurisdictional Problems Between Admiralty and Bankruptcy Courts*, 59 Tulane L.Rev. 1183, 1199–1201 (1985).

4. Prudential argues that it is unfair to retain jurisdiction over the question of the validity of its lien because it, as arresting party with respect to the Lancers, will have to pay out certain expenses and it will have to contest the assertion of seamen's liens, without knowing whether its lien is valid. It, however, faces the same choice were the admiralty courts to determine the issue and offers no reason why any relief granted to the Debtor, should it prevail on the issue, cannot be conditioned on the Debtor reimbursing it for those expenses and the expenses of contesting liens asserted to have a higher priority.

5. In this section, no conclusions of law are

available expertise to resolve technical factual issues. In holding that the bankruptcy court should have deferred a governmental contract dispute to the Board of Contract Appeals, the court in *Gary Aircraft* observed that governmental contract law "tends to be technical and esoteric, and that Boards of Contract Appeals were created precisely because of the needs for expertise, speed, and uniformity in resolving government contract disputes." *Gary Aircraft Corp.*, 698 F.2d at 784.

Here, however, the issues are not factual but legal. Indeed, the facts are seemingly undisputed and are hardly complex. Resolution of this dispute falls within the general competence of judges, and, because it concerns sections of the Bankruptcy Code, it falls within the specialized competence of bankruptcy judges.

The bankruptcy issues arise because the Debtor grounds its challenge to Prudential's asserted lien of $92,885,000 on the status given to it as debtor-in-possession by § 544(a) and seeks to preserve that lien for the benefit of the estate pursuant to § 551 of the Code. Section 544(a) provides:

(a) the trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by:

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such

time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

Section 551 provides for preservation for the benefit of a transfer with respect to property of the estate that is avoided under § 544. Since a transfer includes the parting with an interest in property, 11 U.S.C. § 101(50), avoided liens can be preserved.

Under § 544 the avoidability of a lien is, with the exception of the exclusion of actual notice, dependent upon nonbankruptcy law. *E.g.*, *McCannon v. Marston*, 679 F.2d 13, 16–17 (3rd Cir.1982); *In re Velikopoljski*, 54 B.R. 534 (Bankr.S.D.Fla.1985) (held debtor-in-possession may avoid a mortgage lien not perfected in accordance with the Ship Mortgage Act); *Varon v. Trimble, Marshall & Goldman, P.C., et al., In re Euro-Swiss International Corp.*), 33 B.R. 872, 881, 11 B.C.D. 113 (Bankr.S.D.N.Y.1983); *cf. Matter of Alberto*, 66 B.R. 132, 2 U.C.C. Rep.Serv.2d (Callaghan) 1378 (Bankr.D.N.J.1985) (creditors holding mortgages on Ch. 7 debtor's yacht moved for relief from the automatic stay. The trustee sought to avoid the creditors' security interest. The court noted that the Ship Mortgage Act does not allow post-petition perfection of a mortgage. Reasoning that mortgages were not perfected until the Coast Guard endorsed them and recorded them in accordance with the Act, it held that perfection could not relate back to the date the mortgage was first delivered to

---

drawn with respect to the matters that will be raised in the adversary proceeding that will have to be brought by the Debtor to set aside Prudential's lien in excess of $92,885.00. Nor are all of the contentions of the parties stated. We attempt only to canvass the principal points made and to put them in a legal context in order

to set forth the nature of the dispute. GECC concurred with the Debtor and Creditor's Committee on several points regarding Prudential's mortgage lien; on these points it is not necessary to distinguish which party asserted which position.

the Coast Guard for endorsement and recording.). Such nonbankruptcy issues may also intertwine with bankruptcy issues, at least to the extent that they concern the lack of actual notice status granted by § 544.

Pursuant to 46 U.S.C. § 921(c), a mortgage pertaining to a U.S.-flag vessel must be recorded in the office of the collector of customs at the vessel's port of documentation in order to be valid against the vessel and against any person except the mortgagor and "a person having actual knowledge thereof." The collector of customs is to record mortgages in order of receipt in books indexed to show, *inter alia*, the amount thereof. 46 U.S.C. § 921(b). To enjoy preferred status even as against maritime lienors, a recorded mortgage must be endorsed on the vessel's documents. 46 U.S.C. § 922.

As developed by the parties, not even the issue of validity of the First Mortgage is entirely dependent upon admiralty law. Citing cases arising under state law, *e.g., Phoenix Mutual Life Ins. Co. v. Kingston Bank & Trust Co.,* 172 Tenn. 335, 112 S.W.2d 381, 384 (1938), Prudential contends that the recordation of a document constitutes constructive notice of all its contents. Furthermore, it asserts that a would-be creditor has a duty to examine all documents and that such duty is of particular significance under circumstances where there is an obvious mistake in the record or inconsistency in the recorded documents.

That contention gives rise to bankruptcy law considerations. Under § 544(a)(3), a debtor-in-possession is given the status of a bona fide purchaser of real property. As such, it is subject to the type of constructive notice, *see, e.g., Euro Swiss,* that Prudential claims on this point, and in its additional assertion, that notice could be gleaned from examination of Exhibit A to Amendment No. 1. As noted, that exhibit states that $92,885,000 of principal remained outstanding with respect to the notes issued in 1983, notwithstanding the statement in Amendment No. 1 that the mortgage secures $92,885.00 in principal. But this case does not concern real proper-

ty, and Prudential has not briefed the issue of whether such constructive notice defeats a claim of an execution creditor that was secured by USL upon the filing of its reorganization petition. As noted, § 921(a) of the Shipping Act excepts, in this respect, only "a person having actual knowledge thereof" and § 544(a)(2) confers the status of an execution creditor "without regard to any knowledge of the trustee or of any creditor." Understandably, Prudential does not assert that this issue raises a need for admiralty expertise.

In addition, the Debtor and Creditors Committee essentially contend that the purpose of an amendment is to revise a document. Amendment No. 1 states that the purpose of the mortgage is to secure payment of $92,885.00 which is stated to be the outstanding amount. Accordingly, they assert that any potential creditor could justifiably believe that the outstanding mortgage lien amounted to $92,885.00 on November 24, 1986 when the petition was filed, and that the mistake was not so obvious as to put potential creditors on notice to examine other recorded documents.

Prudential responds that the actual notice requirement of § 921(a) is met by examination of the public record and the documents aboard the Lancers. It relies on cases upholding ship mortgages containing obligations not shown on the face of the Coast Guard "index" documents. *See, e.g., Southland Financial Corp. v. Oil Screw Mary Evelyn,* 248 F.Supp. 520 (E.D.La. 1965) (future advances); *General Electric Credit Corp. v. Oil Screw Triton VI,* 712 F.2d 991 (5th Cir.1983) (attorneys' fees). In turn, Debtor and Creditors Committee note the difference between such items as future advances and attorneys' fees and a statement of the principal due on the obligation secured by a mortgage. They add that Amendment No. 1, recorded on April 1, 1986 and entered in the general index of each vessel, described the amount secured by the First Mortgage as "reduced to $92,-885.00." That same amount was then endorsed by the Coast Guard on the Certificates of Documentation of each of the vessels as the reduced total amount of the First Mortgage, as amended. Accordingly,

to them, the First Mortgage is not perfected beyond the sum of $92,885.00. They thus assert that the First Ship Mortgage does not enjoy preferred status for a higher amount since proper recordation is a prerequisite to preferred status. To this, they add the assertion that a statutory requirement of indexing mandates proper recordation since inquiring parties are usually expected to consult the index rather than the actual instrument on file. *In re Himmelstein*, 5 B.C.D. 288 (Bankr.D.N.J.1979) (mortgage omitting parcels of land considered to be unrecorded as to omitted parcels).

In response Prudential notes that the index and certificates fail to reflect the filing of a partial satisfaction of its First Mortgage in the amount of $126 million. Citing *THE FAVORITE*, 120 F.2d 899 (2d Cir.1941), it states that the lack of a filed partial satisfaction left the original mortgage intact. Here, however, the original mortgage was, after all, amended. The Debtor and Creditors Committee note that the reduction to $92,885 stated on the certificates conveys the same message as a partial satisfaction. Furthermore, it would appear that all *THE FAVORITE* decided is that a preferred ship mortgage remains such after maturity. *See* 120 F.2d at 902.

Resolution of these issues obviously requires no expertise beyond the general competence of judges. Nor is such expertise required to resolve Prudential's assertion that its First Ship Mortgage, as amended by Amendment No. 1, substantially complied with the provisions of the Ship Mortgage Act of 1920 and must be upheld in full.

It is generally said that the recordation and endorsement requirements of the Ship Mortgage Act are to be strictly construed. *See Port Welcome Cruises, Inc. v. S.S. Bay Belle*, 215 F.Supp. 72, 78 (D.Md.1963) ("[s]trict compliance with the Act as a matter of jurisdiction is required"); *accord, e.g., Morse Dry Dock & Repair Co. v. Steamship No. Star*, 271 U.S. 552, 46 S.Ct. 589, 70 L.Ed. 1082 (1926) (lien for repairs held to take precedence over a prior preferred ship mortgage which had not been endorsed at the time of repairs); *THE EMMA GILES*, 15 F.Supp. 502, 504 (D.Md. 1936); *THE OCEAN VIEW*, 21 F.2d 875 (D.Md.1927). As stated by a principal commentary, "The Mortgage Act outdoes the worst of the old-fashioned state chattel mortgage acts in its insistence on formalities of execution and in the detail of its recording mechanics." G. Gilmore & C.L. Black, *The Law of Admiralty*, § 9–52, at 706–07 (2d ed. 1975).

Nevertheless, courts have upheld the validity of ship mortgages under the doctrine of substantial compliance, in the face of minor discrepancies or error not prejudicing third parties. *See, e.g., Seattle First National Bank v. Bluewater Partnership*, 772 F.2d 565 (9th Cir.1985) (bank met minimum statutory requirements to qualify as a trustee); *Merchant's National Bank of Mobile v. The Ward Rig. No. 7*, 634 F.2d 952 (5th Cir.1981) (4–day discrepancy in mortgage date); *Morgan Guaranty Trust Co. v. Hellenic Lines Limited*, 621 F.Supp. 198 (S.D.N.Y.1985) (irregularity in the oath and swearing of individuals, where notaries had witnesses to the execution of mortgages and signed each acknowledgement); *Suburban Trust v. Oil Screw Teddy Bear*, 1975 A.M.C. 1668 (M.D.Fla.1975) (discrepancy as to date on which mortgage was executed); *Lake Jackson State Bank v. Oil Screw Kingfish Too*, 240 F.Supp. 450 (S.D.Texas 1965) (minor errors in affidavit of good faith); *Gulf Coast Marine Ways v. The J.R. Hardee*, 107 F.Supp. 379 (S.D.Texas 1952) (minor error in affidavit of good faith, with no claims of injury or actual fraud).

Analysis of this issue will require, *inter alia*, consideration of whether the First Ship Mortgage, as amended by Amendment No. 1, is to be found in "substantial compliance" with the Ship Mortgage Act of 1920 as that doctrine has been interpreted insofar as a mortgage lien of $92,885,000 is asserted, and in view of the intervening lien status granted to the debtor-in-possession by § 544(a) of the Bankruptcy Code. The *Velikopoljski* and *Alberto* courts did not reach this issue, for in those cases the mortgagees failed to record the mortgages.

Of the cases cited by Prudential, none deals directly with the issue. Only certain *dicta* in *Port Welcome Cruises, Inc. v. S.S. Bay Belle,* bears on the issue. There, the amount of the mortgage was stated to be $1,500,000 on both the documents of the collection of customs of the port of documentation of the ship and on the vessel's documents. Due to a subsequent partial failure of consideration, the debt was reduced to $1,300,000. In holding the mortgage valid, the court stated, "The existence of a lesser lien amount than shown on the documents of the ship, when not the fault of the mortgagee, in no way harms subsequent lienors. If anything, it may help them if the proceeds from a sale of the property is in excess of this amount." *Id.* at 82.

To the Debtor and the Creditors Committee *Port Welcome Cruises* is distinguishable from the case at bar in that here the recorded documents state the lesser amount, and Prudential, as mortgagee, signed them.

More significantly, they assert that substantial compliance cannot be found if the effect is to change the amount reflected by Amendment No. 1. They observe that a recorded document that allegedly understates the amount of a ship mortgage by some $92 million can hardly be said to be in substantial compliance. Moreover, they claim that the estate is to be sorely prejudiced, for to now find such a document to substantially comply with the requirements of the Ship Mortgage Act would defeat the right to preserve that mortgage for the estate that was gained upon the filing of the Debtor's bankruptcy petition.

They further assert that any such finding would impermissibly constitute a reformation of Amendment No. 1. On this score, they at least imply that the substantial compliance doctrine rests on the absence of prejudice to others. They add that reformation should not be ordered in the face of an intervening lien. *E.g., Sky Harbor, Inc. v. Jenner,* 164 Colo. 470, 435 P.2d 894 (1968); *North East Indep. School Dist. v. Aldridge,* 528 S.W.2d 341 (Tex.Civ. App.1975); *Eastern Kentucky Production Credit Ass'n v. Scott,* 247 S.W.2d 983 (Ky.

1952). Accordingly, they rely on several cases holding that a deed or other recorded document cannot be reformed against a trustee in bankruptcy or debtor-in-possession given the lien creditor status provided by § 544(a) of the Bankruptcy Code. *See, e.g., In re Cunningham,* 48 B.R. 509, 512 (Bankr.M.D.Tenn.1985); *In re Dlott,* 43 B.R. 789, 793–94 (Bankr.D.Mass.1983); *In re Robinson,* 38 B.R. 255, 257 (Bankr.D. Maine 1984); *In re Pribish,* 25 B.R. 403, 404 (Bankr.D.Maine 1982); *In re Hunt,* 18 B.R. 504 (Bankr.E.D.Tenn.1982); *In re Himmelstein,* 5 B.C.D. 288, 1 C.B.C.2d 13 (Bankr.D.N.J.1979).

It is thus apparent that application of even the doctrine of substantial compliance involves no resolution of complex and highly technical factual issues, and the doctrine itself brings into play bankruptcy issues through consideration of that doctrine in light of the purpose of § 544(a) of the Bankruptcy Code and the status it confers.

In addition, the dispute involving § 551 of the Bankruptcy Code involves purely bankruptcy issues. GECC asserts that Prudential's First Ship Mortgage can be found valid only in the amount of $92,885. It claims that the Second Ship Mortgage held by it slides down to fill the gap. The Debtor and Creditors Committee assert that § 551 governs and clearly calls for lien preservation.

C. *Resolution*

Notwithstanding the nonfactual nature of the nonbankruptcy issues, the presence of bankruptcy issues, and the lack of need for specialized expertise, Prudential claims that this case is like *Prudential Lines,* where this court held that 11 U.S.C. § 362(b)(12) is self-executing and stated that:

the vacatur of the automatic stay [pursuant to 11 U.S.C. § 362(b)(12) ] revests the admiralty court with jurisdiction to foreclose the debtor's interests. Upon sale, the rights of a debtor to a vessel are extinguished. What remains are the proceeds to be distributed. As to that § 362(b)(12) permits the admiralty court, in light of its specialized nature and expertise, ... to rank maritime liens, hold a sale of a vessel when appropriate under

principles of maritime law and distribute the proceeds of such a sale only to maritime lien claimants and the holders of valid ship mortgages and security interests.

69 B.R. at 451 (citations omitted).

To say that this statement resolves the issue here is to beg the question. Nothing in *Prudential Lines* indicates that the grant of relief from the automatic stay requires that only the admiralty court determine a debtor's challenge to the validity of maritime liens and whether they can be preserved for the estate under applicable bankruptcy principles.[6] Indeed, where validity is to be tested at least in part by bankruptcy principles, as appears to be the case here, it makes no sense to deflect that resolution to the admiralty court.

Nevertheless, Prudential argues that, regardless of the outcome here, the validity of the lien must be tried in eight admiralty courts upon foreclosure of each of the Lancers, because maritime lienors might challenge the preferred status of the First Ship Mortgage as amended by Amendment No. 1. This assertion ignores the Debtor's claim that the $92,885,000 mortgage can be preserved pursuant to § 551 of the Bankruptcy Code for the benefit of the estate if found to be unperfected. Thus, if the Debtor prevails, it would appear that the validity issue need not be addressed in those eight foreclosure proceedings. Conversely, if Prudential prevails, it will have the benefit of a decision that it can present to the admiralty courts in eight foreclosure proceedings. In this it will not be significantly prejudiced. A decision in any one of the eight foreclosure proceedings may not be binding on other foreclosure actions absent joinder of all maritime lien claimants on all vessels. Prudential will seemingly have to present a decision of those courts to the others and argue that it should be followed. If it prevails here, Prudential should be able to do the same thing.

Retaining resolution of the debtor's challenge to the lien claimed by Prudential is, moreover, fully consistent with Judge Sweet's reasoning in *Hellenic Lines*. In addressing the allocation of dispute resolution between the admiralty and bankruptcy courts, Judge Sweet focused on the task to be performed. He observed that, given the broader recognition of admiralty court decrees selling vessels free and clear of liens, that function might best be performed by it, while no such concerns arose with respect to bankruptcy jurisdiction over freight. 38 B.R. at 995–96.

Determination of the validity of Prudential's alleged lien and whether it may be preserved for the benefit of the estate, pursuant to maritime law, bankruptcy principles and state law doctrines, similarly raises no practical need for determination by the admiralty court as opposed to the bankruptcy court. Indeed, given the bankruptcy issues involved, it appears that they should be first determined by a "judge having expertise in bankruptcy law. There is no assurance that a better initial determination would be made by a district court." *Salomon v. Kaiser (In re Kaiser).* 722 F.2d 1574, 1581 (2d Cir.1983).

In addition, it is to be remembered that the bankruptcy courts are often called upon to assess the validity of liens and security interests under a variety of laws which are often considered by state and other federal courts. *See, e.g., NYNEX BISC. v. Beker Industries Corp. (In re Beker Industries Corp.),* 69 B.R. 937, 3

---

6. There was no issue in *Prudential Lines* concerning the validity of a maritime lien. All that is stated therein is that the admiralty court could rank such liens and implicitly determine their validity under maritime law principles. Nor can anything more be drawn from our statement in *McLean,* 74 B.R. at 602 (1987), that it was held in *Prudential Lines* "that issues of validity and ranking of maritime liens fell within the expertise of the admiralty courts and should generally be left to them upon the end of the ninety-day stay of MarAd foreclosure actions provided in 11 U.S.C. § 362(b)(12)." Con-

gress, in providing an automatic exception to the automatic stay in favor of MarAd by enacting § 362(b)(12), did not require the bankruptcy court to determine, in those instances, whether, as provided in § 362(d), the order for relief should vacate or modify the automatic stay. That is precisely the issue here. Moreover, the quoted statement only refers to general practice and not to the instance before us where the challenge to validity rests on and impacts bankruptcy principles and where the facts are neither technical nor complex.

U.C.C. Rep.Serv.2d (Callaghan) 1105 (Bankr. S.D.N.Y.1987). It makes no sense to refer all such issues to other courts. The admiralty courts, moreover, while experienced in handling admiralty matters, are district judges sitting in admiralty. District judges handle all matters of federal jurisdiction. The validity of liens is a core matter within the jurisdiction of the bankruptcy courts; absent application of the traditional grounds for abstention or, as in *Gary Aircraft,* the presence of complex and technical factual issues requiring examination by a body with expertise, they, like all federal courts, have "the unflagging duty to exercise" their jurisdiction. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976); *In re Cobham Enterprises, Inc.,* 62 B.R. 191, 195 (Bankr.S.D.N.Y.1986). The order for relief is thus to provide for this Court's retention of this dispute.

### III.

Accordingly, we now turn to the Debtor's assertion that this Court should only modify the automatic stay, retaining jurisdiction over claims that the Debtor may have under 11 U.S.C. § 506(c) and the distribution of proceeds from the vessels in order to make sure that it obtains recovery "from the property" standing as collateral. 11 U.S.C. § 506(c). Prudential, relying on the legislative history to 11 U.S.C. § 506(c), 124 Cong.Rec. H11,095, H11,111, H11,112 (Sept. 28, 1978), claims that it will make good any final judgment rendered under 11 U.S.C. § 506(c), and, therefore, this Court need not retain the proceeds. It further states that it has no objection to a provision retaining in this Court the ability to determine whether the Debtors may recover under § 506(c).

In the present posture of this case where the Debtor asserts that it will soon be commencing an adversary proceeding contesting the validity of Prudential's lien and seeking to preserve it for the benefit of the estate and an adversary proceeding seeking to charge Prudential with § 506(c) costs, we see no need to resolve the disposition of proceeds issue at this time. The admiralty process will not be completed overnight. Proceeds from the five vessels will be held by the admiralty courts pending resolution of seamen's and other liens. Meanwhile, the parties can try the perfection and preservation issues here. If the Debtor does not prevail, its § 506(c) claims will resume significance and they too can be tried. What court eventually distributes the proceeds from the foreclosed vessels would seem, at this stage, to be of little moment and can be determined later. All that need be done now is (i) modify the automatic stay in order to retain resolution of the issue, rather than vacate it, (ii) require the Debtor to formalize its claims in the near future by filing the requisite pleadings so that they can be handled in advance of, or contemporaneously with, the forthcoming admiralty court proceedings and (iii) preclude distribution of vessel proceeds by the admiralty courts pending further order of this court.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

SETTLE ORDER.